ROBERT S. BREWER, JR.
United States Attorney
Alicia Phillip Williams
Assistant United States Attorney
California State Bar No. 262823
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-8197
Email: Alicia.Williams@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>MANUEL RODRIGUES-BARIOS,<br><br>    Defendant. | Case No.: 20-cr-01684-LAB<br><br>UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INFORMATION, ECF NO. 24 |

## INTRODUCTION

The Court should deny Defendant's motion to dismiss. Congress has plenary power over immigration affairs and its decisions are subject to a highly deferential standard of review. The illegal reentry law easily passes that low standard. Moreover, for over a century, the Supreme Court has made clear that the judiciary cannot strike down an act of Congress on the basis of an alleged illicit legislative motive. Without even citing this "familiar principle of constitutional law," Defendant urges this Court to violate it. Defendant's motion should be denied.

## STATEMENT OF FACTS

On May 22, 2020, Border Patrol agents arrested Defendant just north of the United States/Mexico International Boundary Fence and approximately one mile west of the Calexico, California West Port of Entry. Post-*Miranda*, Defendant admitted he was a citizen of Mexico without any documents that would allow him to enter or remain in the United States. Records checks confirmed Defendant had not applied or received permission to reenter the United States.

Defendant is charged by Information with attempted reentry of a removed alien in violation of 8 U.S.C. § 1326 (a)-(b). On September 30, 2020, Defendant filed the instant motion to dismiss. The United States now responds.

## **RESPONSE**

A.  Statutory Background

In the Immigration Act of 1917, Congress passed legislation requiring deportation of aliens who entered the United States "at any time or place other than as designated by immigration officials, . . . or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. However, there was no penalty, other than repeated deportation, for reentering after deportation. Accordingly, to enhance the deterrent value of the deportation laws, the 70th Congress made reentry after deportation a felony offense punishable up to two years' imprisonment. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018.[1] The Senate Report from the Committee on Immigration outlined the purpose of the law:

> Except [for "members of the anarchistic and similar classes"] . . . there is no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully. It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully. As a matter of fact, in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner.

---

[1] The text stated,

> [I]f any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this Act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this Act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years of by a fine of not more than $1,000, or by both such fine and imprisonment.

2

S. Rep. No. 70-1456, at 1 (Jan. 17, 1929). The report then set out the parameters of the proposed illegal reentry crime and stated, "It is believed that such a statute would be of material aid in enforcing our immigration laws." *Id.*

The Secretary of the Department of Labor—charged at that time with enforcing the country's immigration laws—agreed. In a letter made part of the Senate Report, the Secretary stated that the proposed law "would be of material assistance in the administration of existing immigration laws." The Secretary continued,

> It is academic that no prohibitive law can successfully be enforced without a deterrent penalty. The fact that possible deportation is not a sufficient deterrent to discourage those who seek to gain entry through other than regular channels is demonstrated by the frequency with which this department is compelled to resort to deportation proceedings for the same alien on several succeeding occasions. . . . Aside from the sexual immoral and members of the anarchistic and similar cases there is nothing in the immigration laws which penalizes aliens for reentering the United States unlawfully after they have been deported at considerable expense to the Government. The enactment of a law imposing a penalty is recommended.

*Id.*

Over twenty years later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), an act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163 (introduction).[2] In this renewed and comprehensive legislation (codified at 8 U.S.C. § 1 et seq.), Congress passed another crime for reentry of a deported alien. The text stated,

> Any alien who (1) has been arrested and deported or excluded and deported, and thereafter (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to

---

[2] By 1952, the antagonists in Defendant's motion were either out of Congress (Albert Johnson, Patrick O'Sullivan, Robert Green, John Schafer) or no longer alive (Coleman Blease, James Davis, John Box, Harry Laughlin).

obtain such advance consent under this or any prior Act, shall be guilty of a felony[.]

*Id.* at § 276, 66 Stat. 229 (8 U.S.C. § 1326).

Over the years, Congress has updated § 1326 multiple times—and always to increase its deterrent value. For instance, in the Anti-Drug Abuse Act of 1988, the 100th Congress added subsection (b) to § 1326, creating enhanced penalties for aliens with prior felony convictions. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181. Other modifications occurred in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (increasing the fine provision); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (increasing penalties); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (among other things, limiting collateral attacks on deportation orders in § 1326 prosecutions); and the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (among other modifications, striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed").

B.      Defendant Fails to Establish an Equal Protection Violation

The Court should deny Defendant's motion to dismiss. Immigration laws are subject to a highly deferential standard of review. With the proper standard in view—requiring Defendant, for instance, to negate "every conceivable basis which might support" the illegal-entry law—Defendant's claim fails. The motion likewise fails because it ignores the Supreme Court's prohibition against probing alleged illicit legislative motives.

1.      *Congress's immigration laws are subject to rational-basis review*

For more than a century, "it has been universally recognized that Congress possesses authority over immigration policy as an incident of sovereignty." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1076 (9th Cir. 1998). The Supreme Court has called Congress's inherent immigration power "plenary"; the Ninth Circuit has deemed it "sweeping." *Id.* (citing *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) and *Catholic Social Servs. v. Reno*, 134 F.3d 921, 927 (9th Cir. 1998)). "Whatever the label, all agree

4

that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Id.* (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). Given Congress's expansive authority over immigration affairs, its actions in this area are "largely immune from judicial control," *Fiallo*, 430 U.S. at 792, subject only to "narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976). Indeed, "the reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." *Fiallo*, 430 U.S. at 796 (citing *Mathews v. Diaz*, 426 U.S. 67, 82 (1976); *see also id.* at 792 ("[I]t is important to underscore the limited scope of judicial inquiry into immigration legislation."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) ("deferential standard of review" applies in immigration context).

According to Supreme Court jurisprudence, this "deferential standard of review" is limited to considering whether the law is "facially legitimate and bona fide." *Mandel*, 408 U.S. at 769. In *Mandel*, the Attorney General denied admission to a Belgian journalist who had been invited to speak at a conference at Stanford. 408 U.S., at 756-57. The professors who wished to hear Mandel challenged that decision under the First Amendment, and the Supreme Court acknowledged that their constitutional "right to receive information" was implicated. *Id.* at 764-65. But the Court limited its review to whether the Executive gave a "facially legitimate and bona fide" reason for its action. *Id.* at 769. Given the authority of the political branches over admission, the Court held that "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of U.S. citizens. *Id.* at 770.

The Supreme Court later confirmed that *Mandel*'s deferential test applies equally to congressional decision making. In *Fiallo*, decided in 1977, the Supreme Court considered a congressional law giving immigration preferences to mothers of illegitimate children. 430 U.S. at 795. In other words, the state created a "categorical" entry classification that discriminated on the basis of sex and legitimacy. In reviewing an equal protection

5

challenge alleging discrimination against fathers, the Supreme Court found "no reason to review the broad congressional policy choice at issue . . . under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case." *Id.* at 795. In rejecting the constitutional challenge, the Court remarked that the issue was one "solely for the responsibility of the Congress and wholly outside the power of this Court to control." *Id.* at 799 (quotation omitted). The Court also made clear that it was "not the judicial role in [immigration cases] to probe and test the justifications for the legislative decision." *Id.*; *see also Hawaii*, 138 S. Ct. at 2419 (citing *Fiallo*'s principle that the judiciary is not to probe the justifications underlying Congress's immigration decisions).

In the Ninth Circuit, *Mandel* and *Fiallo*'s "facially legitimate and bona fide" test is "equivalent to the rational basis test typically applied in equal protection cases." *Ablang v. Reno*, 52 F.3d 801, 804 (9th Cir. 1995) (applying rational-basis review and finding the Government "put forth facially bona fide and legitimate reasons" for requiring proof of paternity within a certain time limitation); *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018) (stating that in immigration affairs, outside of citizenship claims, "[w]e have applied *Fiallo*'s standard and looked for only a 'facially legitimate and bona fide reason' to support a statutory distinction"); *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011) ("We review equal protection challenges to federal immigration laws under the rational basis standard . . . ."); *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc) (for equal protection claims, "ordinary rational basis review is the appropriate standard in the immigration context").[3]

---

[3] In a concurring opinion in *Ledezma-Cosino*, three judges said that the government's burden in the immigration context is "even lighter than rational basis: We approve immigration laws that are facially legitimate without probing or testing possible justifications." *Ledezma-Cosino*, 857 F.3d at 1050 (Kozinski, J., concurring). And in *Hawaii*, the Supreme Court stated that "[a] conventional application of *Mandel*, asking only whether the policy is facially legitimate and bona fide, would put an end to our review." 138 S. Ct. at 2420. Nonetheless, at the government's suggestion, the Court went further to apply rational basis review to the immigration policy at issue. In any event, regardless of the precise standard of review, it is no more than rational basis.

Defendant makes a passing remark in a footnote that "Courts apply strict scrutiny to the question of whether a law was 'motivated by a racial purpose or object' under *Arlington Heights*." ECF No. 29 at 6 n.7 (citing *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)). But *Hunt* involved claims of racial gerrymandering, not immigration law, and has no bearing on the proper level of scrutiny here. *Contrast Hunt*, 526 U.S. at 1548-49 ("[o]ur decisions have established that all laws that classify citizens on the basis of race, . . . are constitutionally suspect and must be strictly scrutinized"), *with Fiallo*, 430 U.S. at 792 ("[I]n the exercise of its broad power over immigration and naturalization, Congress regularly makes rules that would be unacceptable if applied to citizens.") (quotation omitted).[4]

In fact, there is another reason Section 1326—which criminalizes unlawful presence in the country—is subject only to rational-basis review. The Supreme Court has made clear that "[u]ndocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'" *Plyler v. Doe*, 457 U.S. 202, 223 (1982). Accordingly, for classifications which apply to aliens illegally present in the United States, rational-basis review applies. *See, e.g.*, *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1065 n.4 (9th Cir. 2014); *United States v. Mendoza-Hinojosa*, 216 F.3d 1085 (9th Cir. 2000) ("[T]here is a distinction between statutes which classify based on alienage and statutes which classify based on criminal actions. Given Congress' plenary power over immigration, imposing different rules on immigrants versus citizens does not in itself create a suspect classification.").

---

[4] In any event, given Congress' plenary authority over immigration, the illegal-reentry law would satisfy strict scrutiny. That is, it is legislation "narrowly tailored to achieve a compelling interest." *Miller v. Johnson*, 515 U.S. 900, 920 (1995). "It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Cortez-Rocha*, 394 F.3d 1115, 1123 (9th Cir. 2005) (citing *United States v. Ramsey*, 431 U.S. 606, 616 (1977)); *see also United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) ("The Government's interest in preventing the entry of unwanted persons . . . is at its zenith at the international border."). Section 1326 achieves that interest in the most possible tailored way.

Based on arguments in other cases, the United States anticipates that the defense will argue that § 1326 is not subject to rational-basis review because it is a criminal law, not an immigration law. That is a distinction without a difference. Indeed, the Ninth Circuit has explicitly found that Section 1326—a criminal law—is "well within the ambit of Congress's sweeping power over immigration matters." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998). "In fact, it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Id.*[5] Likewise, in *United States v. Lopez-Flores*, 63 F.3d 1468, 1470 (9th Cir. 1995), the Ninth Circuit addressed an equal protection challenge to the Hostage Taking Act, 18 U.S.C. § 1203, which classifies offenders and victims based on alienage. The defendants argued that the Act violated the Equal Protection Clause because of this classification. *Id.* The Ninth Circuit held that "[f]ederal legislation that classifies on the basis of alienage, enacted pursuant to Congress' immigration *or* foreign powers, is therefore subject to the lowest level of judicial review." *Id.* at 1475 (emphasis in original). The Court applied rational-basis review and found the "classifications contained in the [Act] were clearly intended to serve Congress' legitimate foreign policy concerns." *Id.* Finally, in *United States v. Ruiz-Chairez*, 493 F.3d 1089 (9th Cir. 2007), the Ninth Circuit applied rational basis review to the illegal reentry sentencing Guideline—a criminal sentencing provision—and found it passed that test. *See id.* at 1091 ("Because the illegal reentry statute is a proper exercise of Congress's immigration power, and because § 2L1.2 properly implements this congressional directive, we must conclude that the 16 level enhancement in §2L1.2 serves a legitimate government interest and has a rational basis.") (citations omitted).

//

---

[5] That analysis by the Ninth Circuit—i.e., that criminalizing reentry is a necessary component of U.S. immigration law—is exactly the reasoning employed by the original Congress in enacting the original illegal reentry crime in 1929. *See* supra at 2-3.

2. *Section 1326 satisfies rational-basis review*

The rational-basis test is an "exceedingly low level of judicial scrutiny." *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000). The test is met where "there is a rational relationship between the disparity of treatment and some legitimate govern-mental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). "[T]he government 'has no obligation to produce evidence to sustain the rationality of a statutory classification'; '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Glickman*, 217 F.3d at 1201 (quoting *Heller*, 509 U.S. at 320).

"The rational basis standard . . . does not require that the [governmental entity] choose the best means of advancing its goals." *Vermouth v. Corrothers*, 827 F.2d 599, 603 (9th Cir. 1987). Instead, all that is needed is some "rational connection" between the rule and the governmental interest, regardless of whether that rule is an "exact fit" for the interest at issue. *Mauro v. Arpaio*, 188 F.3d 1054, 1059-60 (9th Cir. 1999). Moreover, rational-basis review allows for decisions "based on rational speculation unsupported by evidence or empirical data." *United States v. Navarro*, 800 F.3d 1104, 1114 (9th Cir. 2015).

As the background above outlines, and as common sense informs, the government has a legitimate interest in deterring illegal reentry. And there is a clear rational relationship between that interest and § 1326. "In fact, it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Hernandez-Guerrero*, 147 F.3d at 1078.

As the Supreme Court recently stated, "it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Hawaii*, 138 S. Ct. at 2420. "On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" *Id.* (citing *Dep't of Ag. v. Moreno*, 413 U.S. 528, 534 (1973)). That is clearly not the case here with § 1326—a law seeking to deter all aliens from illegally reentering the country following deportation.

Defendant cites the higher percentage of illegal-reentry prosecutions of Mexican and Latin American defendants as proof of disparate impact and discrimination. It is not. Those numbers are a product of geography, not discrimination. For instance, in FY19, Border Patrol had 859,501 total encounters. *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics. Ninety-nine percent of those encounters (851,508) occurred on the southwest border. *See* https://www.cbp.gov/newsroom/stats/sw-border-migration/fy-2019. Those numbers are neither surprising nor illuminating of Congress' motives in the 1920s. Indeed, if it were enough to state an equal protection claim that a broad-scale immigration law disparately impacted individuals of any particular ethnicity—including those from a country sharing 1,954 miles of border with the United States—virtually any such law could be challenged on that ground. *See DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915-16 (2020) (pl. op.) (finding disparate impact of DACA rescission for Latinos from Mexico—totaling 78 percent of DACA recipients—did not establish plausible equal protection claim; "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds") (citation omitted);[6] *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern.").

        3.    *Arlington Heights*

Defendant relies almost exclusively on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). That case, which involved a rezoning request to accommodate the placement of low-income housing—"which would probably be racially integrated" (*id.* at 258)—is inapplicable here. Indeed, Defendant fails to cite any case finding the rubric of *Arlington Heights* applicable to immigration laws

---

[6] For this same reason, Defendant's attempt to show disparate impact under *Arlington Heights* fails. *See* ECF No. 29 at 21-23.

10

passed by Congress. And for good reason: the expansive *Arlington Heights* inquiry is antithetical to the longstanding principle that, with regard to congressional immigration policy, it is "not the judicial role . . . to probe and test the justifications for the legislative decision." *Fiallo*, 430 U.S. at 799. There is no probe more exacting than *Arlington Heights*, which invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." 429 U.S. at 267-68. That does not comport with the plenary power given to Congress over immigration policy and the narrow judicial review over such policymaking.

In fact, the Supreme Court explicitly forbids the type of congressional motive-probing urged by Defendant. *United States v. O'Brien*, 391 U.S. 367 (1968), makes that clear. There, O'Brien burned his selective service registration certified and was convicted under a 1965 law criminalizing such behavior. *Id.* at 370. On appeal to the Supreme Court, O'Brien argued that the 1965 law was unconstitutional because the "purpose" of Congress was to suppress freedom of speech. *Id.* at 382-83. The Supreme Court swiftly rejected this argument, noting "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statue on the basis of an alleged illicit legislative motive." *Id.* at 383. The Court cited a 1904 Supreme Court case which stated:

> The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted.

*Id.* (quoting *McCray v. United States*, 195 U.S. 27, 56 (1904). The *O'Brien* Court noted that the judiciary *can* look to statements by legislators "[w]hen the issue is simply the interpretation of legislation." *Id.* But outside that context, the Court found that it had no authority to probe claimed motives of Congress. Speaking directly to the issue raised in Defendant's motion, the Court stated,

> It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer

11

> than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. *We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it.*

*Id.* at 384 (emphasis added); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 292 (2000) ("Respondent's argument that the ordinance is "aimed" at suppressing expression through a ban on nude dancing . . . is really an argument that the city council also had an illicit motive in enacting the ordinance. As we have said before, however, this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive.") (citing *O'Brien*); *Palmer v. Thompson*, 403 U.S. 217, 224 (1971) ("[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it.") (citing *O'Brien* and other cases); *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984) ("The Supreme Court has held that an otherwise constitutional statute will not be invalidated on the basis of an 'alleged illicit legislative motive,' and has refused to inquire into legislative motives.") (citing *O'Brien*); *Menotti v. City of Seattle*, 409 F.3d 1113, 1130 n. 29 (9th Cir. 2005) ("The Supreme Court has held unequivocally that it 'will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'") (citing *O'Brien*). *O'Brien* flatly prohibits the inquiry Defendant urges the Court to make. This ends the matter altogether.

In any event, Defendant cannot escape the reality that the "governing statutory framework" of United States' immigration law comes from 1952, when Congress replaced prior disparate statutes with the comprehensive INA. *See* Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. § 1 et seq.); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018). Nor can he escape the fact that § 1326 has been updated or modified—each time strengthened—multiple times by Congress, including in 1988, 1990, 1994, 1996, and 1997.

Defendant's motion waves away this lengthy congressional record, claiming "later reenactments do not cleanse the law of its original taint." ECF No. 29 at 20. Under Defendant's view, the taint of prior discriminatory intent forever prevents the criminalization of illegal reentry. This makes little sense. Whether intentional discrimination existed in 1929 legislation—a point contested below—is a question about the motives of the 1929 legislature. Legislative intent is not an artifact that "carr [ies] over" from one law to the next. *See Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (pl. op.) (asking "whether a discriminatory intent has been proved" as to the particular enactment at issue, because "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful"); *cf. Thompson*, 403 U.S. at 225 (citing *O'Brien*; noting "there is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters" because, among other reasons, "it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons").

The cases Defendant relies on for his "forever tainted" argument do not support it.[7] In *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), the Supreme Court held that the Sixth Amendment requires that a jury find a criminal defendant guilty by a unanimous verdict. That result flowed simply from a historical and textual analysis of the Sixth Amendment. Based on that analysis, the Court concluded that a "trial by an impartial jury" "unmistakabl[y]" required a jury to "reach a unanimous verdict in order to convict." *Id.* at 1395. The Court did not hold that the origins of the state laws at issue were the basis for invalidating those state laws. On the contrary, the majority, even while commenting on the racist origins, explicitly stated that "the dissent is right about one thing—a jurisdiction

---

[7] Magistrate Judge Goddard found as much in a written order denying the same defense motion—directed at § 1325, not § 1326—in *United States v. Ruiz-Rivera*, Case No. 20-mj-20306-AHG, ECF No. 61 at 5-6 (S.D. Cal. Sept. 2, 2020) ("There is no support for Defendant's suggestion that § 1325(a)(1) should be judged according to the legislative history of the [Immigration Act of 1929], and Defendant has not attempted to argue that § 1325(a)(1) would be unconstitutional under an *Arlington Heights* analysis of relevant legislative history.").

1 adopting a nonunanimous jury rule even for benign reasons would still violate the Sixth
2 Amendment." *Id.* at 1401 n.44; *see id.* at 1426 (Alito, J., dissenting) ("If Louisiana and
3 Oregon originally adopted their laws allowing non-unanimous verdicts for these reasons,
4 that is deplorable, but what does that have to do with the broad constitutional question
5 before us? The answer is: nothing."). Defendant's characterization of *Ramos* is that the
6 Court's discussion of the racial underpinnings of the state law drove the outcome. Instead,
7 as the majority acknowledged, it was entirely superfluous. In any event, *Ramos* does not
8 apply here because it does not involve immigration law and the concomitant deferential
9 standard of review.

10 *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), is similarly
11 irrelevant. There, the Supreme Court considered whether application of a "no-aid"
12 provision in Montana's constitution to bar religious schools from participating in a state
13 scholarship program violated the Free Exercise Clause of the First Amendment. *Id.* at 2254.
14 The answer was yes, because the provision "plainly exclude[d] schools from government
15 aid solely because of religious status." *Id.* at 2255. The Court did *not* find the provision
16 unconstitutional because of any "checkered tradition," as Defendant suggests. ECF No. 29
17 at 20. That phrase appears briefly in the opinion in response to the argument that a tradition
18 arose in the late-19th century against state support for religious schools. *Espinoza*, 140 S.
19 Ct. at 2258. The Court rejected that movement as illuminating the historical understanding
20 of the Free Exercise Clause. *Id.* at 2259 ("The no-aid provisions of the 19th century hardly
21 evince a tradition that should inform our understanding of the Free Exercise Clause."). In
22 other words, neither *Ramos* nor *Espinoza* stands for the proposition Defendant claims—
23 that "not only do courts examine the racial motivations of a law at the time of its passage,
24 later reenactments do not cleanse the law of its original taint." ECF No. 29 at 20.

25 As a final example of Defendant's erroneous taint argument, several courts have
26 recognized that, when a state reenacts a voting provision that was intentionally
27 discriminatory at its origin, the ultimate focus in subsequent litigation is the intent of the
28 reenacting legislature, not the original one. *See Hayden v. Patterson*, 594 F.3d 150, 166-

167 (2d Cir. 2010) (addressing felon-disenfranchisement law); *Johnson v. Governor*, 405 F.3d 1214, 1223-1224 (11th Cir.) (en banc) (same); *Cotton v. Fordice*, 157 F.3d 388, 391-392 & n.7 (5th Cir. 1998) (same); *Chen v. City of Houston*, 206 F.3d 502, 520-521 (5th Cir. 2000) (addressing racial-gerrymandering claim). Those courts also have rejected the proposition that prior intent "remains legally operative" unless and until some affirmative contrary showing is made. *Johnson*, 405 F.3d at 1223; *see Hayden*, 594 F.3d at 166-167; *accord Cotton*, 157 F.3d at 392 (affirming that plaintiff was required to show that the "current version" of the law was "adopted out of a desire to discriminate").

In any event, even assuming that: (1) Defendant's "forever tainted" position is permissible, (2) it is permissible for the Court to probe the motives of Congress; and (3) *Arlington Heights* applies to probe the justifications of Congress' immigration actions, Defendant's claim still fails. To begin, Defendant fails to show a cognizable disparate impact. As outlined above, the statistics Defendant cites for disparate impact are a feature of Mexico's proximity to the United States—not discrimination. That alone is enough to reject Defendant's *Arlington Heights* analysis. *See, e.g.,* ECF No. 29 at 21 (Defendant agreeing that *Arlington Heights* requires establishing a law "disparately impacts a particular group"); *Regents*, 140 S. Ct. at 1915-16 ("because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds").

Moreover, Defendant's perspective that early immigration laws, leading to the 1929 illegal entry law, were premised on racial animus towards Mexicans is considerably undercut by the fact that people born "in the republic of Mexico" were not subject to the quotas established by the Immigration Act of 1924. On the contrary, an immigrant born in "the Republic of Mexico" was defined as a non-quota immigrant on par with those born in Canada and several other places. *See* Pub. L. No. 68-139, § 4, 43 Stat. 155. For some—Asia, for instance—the quota system completely excluded immigration. *See*

15

https://history.state.gov/milestones/1921-1936/immigration-act. These facts do not comport with Defendant's view that Congress was actively developing legislation with the intent and purpose of discriminating against persons from Mexico.

Digging slightly deeper into Defendant's claims reveals they are misleading. Indeed, Defendant selectively edits quotations from the Congressional record to support his theory. For instance, Defendant says that Rep. Thomas L. Blanton "complained that Mexicans 'come into Texas by hordes[.]'" ECF No. 29 at 16. But the full context shows Rep. Blanton was discussing the need to preserve jobs for American citizens. Indeed, just moments later, Rep. Blanton stated, "They are taking away jobs from American citizens." 70 Cong. Rec. 3619 (1929).

As another example, Defendant states that Rep. Blanton "urged the House to 'apprehended the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there." ECF No. 29 at 16. Defendant omits the very next sentence, which again is directly tethered to jobs: "Then you would not have the report coming in here from Austin, Tex., and many other places that many Americans are going to be without jobs[.]" 70 Cong. Rec. 3619 (1929).

As yet another example, Defendant says Rep. Blanton "challenged others to visit the international ports of entry in Texas to see the 'hordes that come across the bridges with no intention of ever going back.'" ECF No. 29 at 16. Defendant inserted a period at the end of that quote, but it was actually a comma. The full quote—again job focused—reads:

> If the gentleman from Washington will go down to the international bridge at Brownsville, or if he will go to the one at Laredo, or at El Paso, or any of those international bridges . . . [a]nd stand there, he will see the hordes that come across the bridges with no intention of ever going back, *coming across to get jobs of Americans*, and if he would ride up and down the Rio Grande River for miles and see them coming in in hordes, the gentleman would take some action to stop it. I am sorry that he is not going to be able to take much action along that line, but somebody else in his place ought to do it, and it ought to be stopped, and if we do not do it we are going to have Americans starving to death in the Hoover administration.

70 Cong. Rec. 3619 (1929).

16

Another example of a misleading quotation is where Defendant quotes Rep. Schafer as saying, "[t]hese Mexicans also come into Wisconsin in droves[.]" ECF No. 29 at 16. He cuts off Rep. Schafer's comments there. The full quote from Rep. Schafer shows he was referring to preserving jobs. "These Mexicans also come into Wisconsin in droves, *and take the places of American citizens in the factories and on the farm*. Often we see the spectacle of war veterans walking the streets unable to obtain employment because of the unfair competition of cheap Mexican labor." 70 Cong. Rec. 3619 (1929) (emphasis added).

Likewise, Defendant cites some startling comments of Rep. John Box, but Defendant omits his comments during the congressional debate regarding the job problems facing his constituents in Texas. "They do take the places of American workmen, who are already put to it to find jobs; in fact, there are hundreds of thousands, possibly millions, of Americans out of employment right now." *Id.*

And again, Defendant cites a "radio speech" given by Rep. Robert Green in January 1928, seizing upon several startling snippets. The complete speech shows Rep. Green was not targeting Mexicans. Rather, Rep. Green outlined his broad immigration policies, seeking a general strengthening of immigration law. Rep. Green saw a "tremendous situation" facing immigration authorities. 69 Cong. Rec. 2461 (1928). He observed that "[h]undreds of thousands of aliens cross these borders annually, thousands of whom remain in the United States." *Id.* He noted that the "immigration department" employed only 2,700 people, which was "inadequate to cope with some 7,000,000 aliens and some 10,000 miles of border to patrol." *Id.* Rep. Green stated that 113,105 aliens were "inmates of United States prisons, penitentiaries, jails, insane asylums, hospitals, and poorhouses." *Id.* He continued, "[t]he economic loss represented by these figures is appalling." *Id.* Rep. Green spoke at length about the "communists" and "bolshevists"—not Mexicans—"here working in this country to destroy our Constitution, our people, our Army, our Navy, our churches, our homes." *Id.* at 2462. He also spoke about immigration from Mexico, stating "hundreds of thousands of Mexicans are pouring into our country, oftentimes at the behest of the various employers of large industrial enterprises." *Id.* He also stated—regrettably, but

17

clearly not singling out Mexicans—that it was "time to entirely stop the islands, Europe, Asia, and Africa from dumping their scum and riffraff on our beautiful American shores." *Id.*

The point is not that these Congressmen did not say things they shouldn't have. It is that indulging even briefly in Defendant's desired probe of the Congressional record reveals a more complicated, multi-dimensional picture than the flat caricature painted by Defendant. The endeavor also reinforces the Supreme Court's caution—leading to the prohibition against probing motives—that "it is extremely difficult for a court to ascertain the motivation, or collection of difference motivations, that lie behind a legislative enactment." *Palmer*, 403 U.S. at 224. For "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *O'Brien*, 391 U.S. at 384.

At the conclusion of the *Arlington Heights* analysis Defendant claims the government would have to show that the contested law would have passed "even had the impermissible purpose not been considered." ECF No. 29 at 24 (citing *Arlington Heights*). There is no need to reach this point. Still, Congress *did* pass a new illegal reentry law in 1952, which was later amended multiple times. Defendant does not suggest any discriminatory purpose with those pieces of legislation.

Finally, there is no need for an evidentiary hearing. Defendant's entire claim rests on *Arlington Heights*. But his claim fails for many reasons besides *Arlington Heights*. There is therefore no reason to hold an evidentiary hearing. *See, e.g., United States v. Irwin*,

//
//
//
//
//
//

612 F.2d 1182, 1187 (1980) (evidentiary hearing not required where the material provided to the court "show as a matter of law that [the defendant] was not entitled to relief").

## CONCLUSION

Defendant's motions should be denied.

DATED: October 11, 2020                    Respectfully submitted,

                                            Robert S. Brewer, Jr.
                                            United States Attorney

                                            */s/ Alicia P. Williams*
                                            ALICIA P. WILLIAMS
                                            Assistant United States Attorney