```
 1                    UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5        Plaintiff,                  ) No. 20-CR-1684-LAB
                                      )
 6            v.                      ) October 21, 2020
                                      )
 7   MANUEL RODRIGUES-BARIOS,         ) 10:31 a.m.
                                      )
 8        Defendant.                  ) San Diego, California
     _____)
 9

10            TRANSCRIPT OF MOTION HEARING (EXCERPT)
              BEFORE THE HONORABLE LARRY ALAN BURNS
11                  UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:      UNITED STATES ATTORNEYS OFFICE
                             By:  ALICIA WILLIAMS, ESQ.
14                           880 Front Street
                             San Diego, California  92101
15
     For the Defendant:      FEDERAL DEFENDERS OF SAN DIEGO, INC.
16                           By:  CASSANDRA LUCINDA LOPEZ, ESQ.
                                  KARA HARTZLER, ESQ.
17                           225 Broadway
                             San Diego, California  92101
18
     Court Interpreter:      SALVADOR CASTELLANOS
19
     Court Reporter:         CYNTHIA R. OTT, RDR, CRR
20                           District Court Clerk's Office
                             333 West Broadway, Suite 420
21                           San Diego, California, 92101
                             cynthia_ott@casd.uscourts.gov
22

23

24

25   Reported by Stenotype, Transcribed by Computer
```

```
 1          SAN DIEGO, CALIFORNIA, OCTOBER 21, 2020, 10:31 A.M.
 2                            * * * *
 3             (Beginning of Excerpt.)
 4             THE COURT:  That brings us finally to the motion to
 5   dismiss.  I've read the motion carefully.
 6             Ms. Lopez, has this motion been brought before or is
 7   this the first time?  Not in this case, I mean in other cases.
 8             MS. LOPEZ:  Yes, I think it's been filed in a couple
 9   of --
10             THE COURT:  Oh, and what's happened in those other
11   cases?  Has anyone granted it?
12             MS. LOPEZ:  I don't believe it's been granted by any
13   other judge in our district.
14             THE COURT: Yeah, okay.  Well, if you'd like I can
15   give you my take on it and maybe that'll help sharpen the
16   argument.
17             MS. LOPEZ:  Thank you, Your Honor.
18             THE COURT:  The government points out in two cases,
19   Mandel and Fiallo, the Ninth Circuit has ruled on one of the
20   issues implicated by the motion and said that the 1326 is
21   facially legitimate, actually the method of determining whether
22   a statute was racially motivated is to be determined by these
23   standards.
24             And they say you look and determine whether it's
25   facially legitimate, this one is obviously.  You don't even
```

1 make the argument that it wasn't.  It's the background that
2 leads to the enactment of this that really is the focus of the
3 motion, so facially legitimate and bona fide.
4          And the Ninth Circuit says that this is a fairly low
5 bar, they quote former Chief Judge Kozinski saying that it's
6 just a rational basis and that the government has great leeway
7 to legislate in this area.
8          I don't see anything here.  I mean I take your point,
9 it kind of makes sense that because we're a border district
10 we're likely to see more people trying to come in and violate
11 the statute from particular countries, that would be countries
12 south of us, directly south, Mexico and Central America.
13          I mean, that just makes sense.  But it's not
14 exclusive, of course.  In the last five years, I think, maybe
15 even longer, there's been an influx of Chinese coming in who
16 make their way into Central America and into Mexico and then
17 try to come into the United States.
18          So it's not limited just to Hispanic, and I have to
19 tell you, I see people from all different nations trying to
20 come in.  I have in the past.  But, what's true is that, you
21 know, more often than not it's people from Mexico or Mexican
22 citizens or Central America.
23          But as I said, that has more to do with the lay of the
24 land and the fact that we're on a border that is just north of
25 Mexico than anything else.  I don't think that has anything to

1  do with the allegedly racist motivations of legislatures back
2  in the 1920s or in 1917.
3          So it would be a stretch for me as an individual
4  district judge to find that 1326 was racially motivated over a
5  hundred years ago and, therefore, the statute has to be struck
6  down in all of its applications.
7          That's my preliminary finding.  I'm happy to hear from
8  you.
9          MS. LOPEZ:  Thank you, Your Honor.
10         We are asking the Court to dismiss the indictment
11 because 1326 violates the equal protection clause of the Fifth
12 Amendment.  And the facts -- as the Court notes, the facts and
13 the historical evidence do establish, and we've cited some of
14 the legislative testimony, some of the expert testimony that
15 was heard at those hearings in 1929 that it was enacted with a
16 discriminatory purpose.
17         THE COURT:  Hasn't the statute been amended several
18 times since the original enactment?
19         MS. LOPEZ:  It has been amended, Your Honor.
20         THE COURT:  Doesn't that change things?  I mean, it
21 doesn't mean that the Congress at the time of the amendments is
22 putting its imprimatur on what's happened before.  The fact
23 they're changing it suggests that they're not, that they looked
24 at it again, determined it needs to be changed in some
25 respects.

1             Why would I look back to some original enactment of
2    the statute that is no longer in play, no longer operative,
3    rather than the most recent enactment and study the motives of
4    the Congress at the time of the most recent enactment?  Why
5    wouldn't I do that?
6             MS. LOPEZ:  So, Your Honor, two recent Supreme Court
7    cases do confirm that the discriminatory purpose that fueled
8    the law's original enactment remains relevant in determining
9    its constitutionality.  And we cited -- we briefed both of
10   those cases, Ramos and Espinoza.
11            Ramos involved the statute or the law in Louisiana and
12   Oregon that allowed for a person to be convicted of a violent
13   felony on only 10 jurors and the Court went back and looked at
14   the motivations underlying the original law --
15            THE COURT:  Right.
16            MS. LOPEZ:  -- and concluded that it was a racist
17   motivation, that there was in Ramos or in Louisiana a desire to
18   dilute the jury pool.
19            THE COURT:  Right.
20            MS. LOPEZ:  And, you know, that was part of their
21   analysis in striking down the law.  And, likewise, in Espinoza
22   versus Montana which was a case that involved religious
23   discrimination.  The Supreme Court struck down a Montana law
24   that prohibited families from using state sponsored scholarship
25   at religious schools finding that it was religious

1    discrimination that underlaid the legislature decision to pass
2    that law.
3              THE COURT:  Is it your view that Congress if they
4    totally repealed this would be unable because of the history of
5    discrimination in this field, would they be unable to enact
6    another law that forbade people from coming into the United
7    States without permission?
8              MS. LOPEZ:  No, Your Honor, and we recognize that the
9    government has an interest in establishing laws that govern
10   both immigration -- and we would make a distinction, by the
11   way, between Congress's plenary powers with respect to
12   immigration laws --
13             THE COURT:  Right.
14             MS. LOPEZ:  -- versus this 1326 charge being a
15   criminal law.
16             THE COURT:  So here's the question I have for you,
17   Ms. Lopez, if they can do it anew, if they can wholly repeal
18   1326 and then reenact it and that washes away all of the
19   previous taint, why isn't that done by an amendment where they
20   consider the law and say it needs these fixes and we're going
21   to fix it?
22             Why would they have to totally repeal it and then
23   reenact it, probably in materially the same form?  Why is that
24   different from just amending the law and making changes in it
25   and, thereby, repudiating whatever the motive was of the

1  drafters of the law and those that voted for it in 1917?
2          MS. LOPEZ:  Your Honor, I think if Congress wants to
3  pass legislation criminalizing immigration, in order -- let's
4  say the 1326, in order to overcome the racial bias that
5  animated the original legislation, they would have to have a
6  discussion on the record for the need for this law to exist
7  that is outside the original racial bias that was --
8          THE COURT:  Who would require that?
9          MS. LOPEZ:  Under --
10         THE COURT:  The courts?  The courts would require
11 that?
12         MS. LOPEZ:  I think --
13         THE COURT:  How does that not violate the separation
14 of powers to dictate to Congress what discussion they must have
15 before they enact a law?
16         I mean, it seems to me that's a blatant violation of
17 separation of powers.  It's the Court telling them how to
18 legislate and what's required before they enact legislation.
19         MS. LOPEZ:  No, Your Honor, but for this court to
20 determine whether or not this law violates equal protections,
21 here the government -- once we've established that there was
22 racial bias and that it's been disparately applied to Mexicans
23 and Latinos, Latinx communities, then the burden shifts to the
24 government to show that there was some other -- that basically
25 without there being that original racial bias, the law would

1  have been passed anyway.
2          THE COURT:  I'm not sure of the second prong,
3  Ms. Lopez, as to what you said.
4          Let me assume for the sake of argument that maybe some
5  of the people that enacted this did have a discriminating
6  motive back in 1917.  I'll -- again, I'm not making that
7  finding, I'll assume that.  But what's the evidence that it's
8  been disproportionately applied to people from Latin American
9  countries, Mexico and the like?
10         MS. LOPEZ:  Your Honor --
11         THE COURT:  Of course, we see those, I mean anyone who
12 wakes up in the morning in San Diego would say, yes, yes, we
13 have kind of a thriving population of people from Central
14 America and Mexico because we're so close.
15         When I do immigration ceremonies, the great bulk of
16 people -- I mean there's people from all nations and we usually
17 call them out, there might be 50 different nations.  But I can
18 tell you the great bulk of people who are sworn in as new
19 citizens come from Mexico, probably second, you know, the
20 Philippines, but Mexico always dominates the immigration
21 ceremonies.  That's not unusual, it's not remarkable, it's
22 because we're very close here.
23         MS. LOPEZ:  Sure.
24         THE COURT:  So I don't see the second part of it that
25 somehow this has been applied unfairly against

1   Hispanic -- people from Latin American countries.
2           MS. LOPEZ:  Your Honor, I think overwhelmingly the
3   statistics nationwide are that 1326 charges are brought against
4   Mexicans, increasingly as the Court notes there's been more
5   Central Americans --
6           THE COURT:  But why do you assume that that's because
7   of discrimination as opposed to having a several thousand mile
8   border that borders Mexico?
9           MS. LOPEZ:  For example, Your Honor, we don't see that
10  number of convictions apply to or charges brought against
11  Canadians.
12          THE COURT:  No, no, I --
13          MS. LOPEZ:  We share the same length of border with
14  Canada and we don't have illegal reentry charges being brought
15  against Canadians.
16          THE COURT:  Yeah.
17          MS. LOPEZ:  We also don't have, Your Honor, 1325 or
18  1326 charges, 1325 charges brought against, say, visa overstays
19  or criminal prosecutions targeted against visa overstays.
20  Those individuals tend to come from Europe or from other
21  countries.
22          We see 1326 being applied to Mexicans, more recently
23  some Central Americans, but, Your Honor, I've been doing this
24  work for 10 years in this district and in those 10 years I've
25  had three clients that were not Mexican or Central American.

1        THE COURT: Are they charging Hispanic people under
2   1326 who overstay visas? Or is it just, I mean that's one area
3   where they're not bringing charges regardless of where the
4   person is from who's overstayed?
5        MS. LOPEZ: That I don't have the answer to. I'm
6   happy to do some additional research.
7        THE COURT: Well, it's an important distinction
8   because I can see them saying, look, we're going to prioritize
9   people coming in, in the first instance, jumping over fences,
10  coming around barriers, crossing in, but we just don't have the
11  resources to go after visa overstays. That requires a lot more
12  legwork, right? We've got to find out where they are and track
13  them down if they've moved somewhere else.
14       It's much easier to devote our resources to people
15  whose criminality is apparent because we catch them coming
16  across.
17       MS. LOPEZ: Your Honor --
18       THE COURT: That doesn't sound to me like a racial
19  motive. That sounds to me like practicality dictated by
20  resources.
21       MS. HARTZLER: Your Honor, I'm sorry, Kara Hartzler
22  for Federal Defenders. Do you mind if just I clarify a legal
23  point?
24       THE COURT: No, go ahead.
25       MS. HARTZLER: Thank you, Your Honor. I just want to

1  clarify that under the Arlington Heights standard, we have to
2  show discriminatory intent at the time the law was passed and
3  then that there is a disparate impact currently.
4           Now the current disparate impact does not need to be
5  the result of a discriminatory intent.  We don't need to show
6  that necessarily they're going after Mexicans as opposed to
7  Canadians.  All we have to show is that there is a disparate
8  impact, and the reason behind that is because Arlington Heights
9  challenges are mostly geographically based, if they're about
10 housing, zoning, things like that.
11          So I don't want to give the impression that we are
12 setting up a legal standard where we have to show current
13 discrimination.
14          THE COURT:  Okay.
15          MS. HARTZLER:  Only discrimination at the time the law
16 was passed.
17          THE COURT:  Okay.  I'll keep that in mind.
18          MS. HARTZLER:  Thank you, Your Honor.
19          THE COURT:  Go ahead, Ms. Lopez.
20          MS. LOPEZ:  Just a moment, Your Honor.
21          MS. HARTZLER:  If I could just clarify one other
22 point, Your Honor, and I appreciate Your Honor's indulging me
23 on this, basically this is a real evolving area of law and
24 Ramos and Espinoza have put a lot of these things into
25 discussion and so I understand Your Honor's position.

```
 1              I think that really going to the issue of the
 2   reenactment, if there were a situation where Congress went in
 3   and said you know what, we are going to, you know, really
 4   discuss this law and we're going to -- to go over these issues
 5   and really affirm that we want to criminalize this for
 6   nonracially discriminatory reasons then I don't think we'd have
 7   any problem with it.
 8              The problem is they never did that in any of these
 9   reenactments.  They never did it in 1952, 1965, 1990.  All they
10   did is they changed the penalties, and that is not enough.
11              And our position is that because there was not that
12   meaningful discussion, then the original racist discriminatory
13   intent pervades, unless the government can show that there was
14   some sort of meaningful reenactment and they haven't shown
15   that.
16              THE COURT:  You say disparate impact, what if the
17   statistics show that phenomena occurs much more frequently at
18   the southern border than the northern border?  And the
19   government's had nothing to do with that.
20              I mean, it's not an impact by a government policy,
21   it's caused by the flow of people from one hemisphere -- well,
22   from one geographical area rather than the other.
23              Disparate impact usually means that the government is
24   applying the law in such a way that it affects one group more
25   than others.
```

1              What if that's not the case?  What if that group is
2    just coming to the attention of the judge -- or of the
3    authorities because it's disproportionate criminality on their
4    part?
5              MS. HARTZLER:  Again, Your Honor, I think that goes to
6    the issue of that is assuming that there needs to be a showing
7    of current discriminatory intent.
8              THE COURT:  No, I'm talking about disparate impact,
9    Ms. Hartzler, I'm not talking about discriminatory intent at
10   that point.  Let's assume that that's the case.  I don't see
11   the disparate impact here of the government's enforcement
12   policy.
13             The statistics probably show that people are pouring
14   in at the southern border, not the northern border, and the
15   government's policy has nothing to do with that.  It doesn't.
16   I mean, the fact that they're reacting down here doesn't mean
17   that fewer people are deterred coming in from the northern
18   border, it's just that they're not doing it to the level they
19   are here.
20             So to me disparate impact means that the government is
21   applying the law in such a way that it in a disparate way
22   affects a group of people and is not being applied evenly.
23             I think they're applying it -- seems to me they're
24   applying it evenly.  If you come in through Canada, you're
25   going to get arrested too, there's just fewer people doing it.

1  So to point to that phenomena and say, well, this means that
2  the government has it out for Hispanics, I don't agree with
3  that.  It doesn't seem logical to me.
4           MS. HARTZLER:  Two points, Your Honor, first of all, I
5  think that's conflating a separate type of equal protection
6  violation with selective prosecution and that's totally
7  different than what we're arguing here under Arlington Heights.
8           And then the second thing I would say is, disparate
9  impact, we don't have to show why a disparate impact occurs,
10 all we have to show is that it does occur.
11          If you had to show why it occurred, then many, many
12 cases under Arlington Heights would never have succeeded, they
13 would have come out differently, because a lot of times the
14 disparate impact is the product of geography in many, many
15 cases.  So disparate impact, we don't have to show why it's
16 happening only that it is happening and we have shown that here
17 because, frankly, 99 percent of people who are prosecuted for
18 1326 are Mexican or Latinx.
19          THE COURT:  Well, okay, I may not agree with the
20 second point.  It seems to me that disparate impact requires at
21 least some judgment or indifference on the part of the
22 government which results in a disparate impact.
23          And if that is not the reason that there's a disparate
24 impact, that that's not the reason that people from one
25 geographical location are being arrested to a greater extent,

1    it's because of the flow of people in, then I wouldn't lay that
2    on the government.
3             I mean, the government is trying to enforce the law
4    equally and somehow they're held up because more people are
5    violating the law at the southern border than the northern
6    border?  That doesn't make any sense to me.
7             Why would we punish the government for equal
8    application of the law when it's totally out of their hands who
9    violates the law and to what extent?
10            Anyway, Ms. Lopez, anything else on this?
11            MS. LOPEZ:  There was just one final point I wanted to
12   make, Your Honor, and that is that the government in their
13   reply indicates that, you know, there is some evidence in the
14   record for other reasons underlying the legislation.
15            So for example, like on page 16 they say look, going
16   into like a fuller context, we can see that the representatives
17   were concerned about preserving American jobs.
18            But, Your Honor, we don't have to prove that jobs or
19   that, you know, that the legislators had -- didn't have another
20   reason, only that race and racial animus was one of the reasons
21   that animated the legislation, not that there was no other
22   reason and that 's -- in order to meet the standard under
23   Arlington Heights.  And that's all.
24            THE COURT:  Thank you, Ms. Lopez.
25            On behalf of the United States.

```
 1            MS. WILLIAMS:  Your Honor, we would just emphasize
 2   here that the appropriate test is rational basis test as the
 3   Ninth Circuit has already outlined, so we don't even make it to
 4   discriminatory intent nor disparate impact.  It's clear from
 5   the legislation that the legislative arguments are the
 6   cherry-picked statements that the defense laid out, that there
 7   was a reasonable motive for Congress passing this particular
 8   law.
 9            And we don't believe that there is a distinction
10   between -- in Congress's plenary powers to litigate or to,
11   sorry, legislate immigration issues between criminal
12   immigration and just a standard immigration statute.
13            It's clear that they instituted the criminal statute
14   to add an additional incentive to discourage people from
15   entering the United States and in the case of 1326 specifically
16   reentering the United States for individuals who had already
17   been removed from the United States and had then decided to
18   come back.
19            So with that, unless the Court has any specific
20   questions, the United States would submit on our filings.
21            THE COURT:  No, I don't.
22            Look, let me say this, I understand that I would never
23   be the final say on something like this and I'm happy for that.
24            The matter has been fully briefed.  The arguments in
25   favor of the motion to dismiss have been highlighted by
```

1  Ms. Hartzler and Ms. Lopez today, but they're also contained to
2  a fuller extent in documents that were filed.  They're all
3  preserved.
4         The government's response thereto is preserved.  The
5  Court kind of hit around the edges on this, but I agree in the
6  final analysis with Ms. Williams statement that it's rational
7  basis, the Court finds a rational basis for this.
8         It's also -- I would be also very surprised, let me
9  jump past the Ninth Circuit, if the Supreme Court said, yeah,
10 we're going to invalidate a law based on what we think the
11 motives of the legislature was in criminal law in 1917.
12        So much has changed since then in this country that to
13 go back and say, well, we're going to make up for this law that
14 we think maybe had some bad motives, particularly when it's
15 reenacted a number of times as this one has been and there's
16 been an opportunity to look at everything again, and in form
17 and in substance it comes out the same.
18        I understand that was the dissent position by Judge
19 Alito and he's acknowledged that that's not so, but I have a
20 feeling put in the context of a criminal statute that's
21 designed to protect the borders of the United States, the
22 result might be different.
23        So while I conceive all of the arguments, I disagree
24 with them.  I don't find that facially or as applied this law
25 violates equal protection of offenders who are charged under

1  it.  The motion to dismiss is denied.
2      (The excerpt concluded at 10:50 a.m., October 21, 2020.)
3                    COURT REPORTER'S CERTIFICATE
4
5      I, CYNTHIA R. OTT, Official Court Reporter, United States
6  District Court, Southern District of California, do hereby
7  certify that pursuant to 28 U.S.C. §753 the foregoing is a
8  true, complete and correct partial transcript of the
9  stenographically reported proceedings had in connection with
10 the above-entitled matter and that the transcript page format
11 is in conformance with the regulations of the Judicial
12 Conference of the United States.
13
14      DATED at San Diego, California, January 17, 2021.
15
16                            _____/s/ CYNTHIA R. OTT_____
                              CYNTHIA R. OTT, RDR, CRR
17
18
19
20
21
22
23
24
25