1               UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED STATES OF AMERICA,          )
                                       )
5         Plaintiff,                   )   No. 20-CR-1684-LAB
                                       )
6              v.                      )   June 15, 2021
                                       )
7   MANUEL RODRIGUES-BARIOS,           )   11:07 a.m.
                                       )
8         Defendant.                   )   San Diego, California
    _____   )
9

10              TRANSCRIPT OF BENCH TRIAL AND SENTENCING
                 BEFORE THE HONORABLE LARRY ALAN BURNS
11                   UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:       UNITED STATES ATTORNEYS OFFICE
                             By:  ALICIA WILLIAMS, ESQ.
14                           880 Front Street
                             San Diego, California  92101
15
    For the Defendant:       FEDERAL DEFENDERS OF SAN DIEGO, INC.
16                           By:  CASSANDRA LUCINDA LOPEZ, ESQ.
                                  LEAH WEATHERLY GONZALES, ESQ.
17                           225 Broadway
                             San Diego, California  92101
18
    Court Interpreter:       DANIEL NOVOA; MARIAPAZ SANDOVAL
19
    Court Reporter:          CYNTHIA R. OTT, RDR, CRR
20                           District Court Clerk's Office
                             333 West Broadway, Suite 420
21                           San Diego, California, 92101
                             cynthia_ott@casd.uscourts.gov
22

23

24

25  Reported by Stenotype, Transcribed by Computer

I N D E X

E X H I B I T S

<u>PAGE</u>

Government's Exhibit 13 was received in evidence....  10

1          SAN DIEGO, CALIFORNIA, JUNE 15, 2021, 11:07 A.M.

2                              * * * *

3          THE CLERK:  Calling number 1 on the calendar,

4     20-CR-1684, United States of America versus Manuel

5     Rodrigues-Barios, on for a bench trial.  If counsel could state

6     their appearances for the record, please?

7          MS. LOPEZ:  Good morning.  Cassandra Lopez and Leah

8     Gonzales, Federal Defenders, on behalf of Mr. Rodrigues-Barios.

9     He is present in custody.

10         THE COURT:  All right.  Good morning.

11         MS. WILLIAMS:  Good morning, Your Honor.  Alicia

12    Williams for the United States.

13         THE COURT:  Good morning, Ms. Williams.

14         All right.  The Court met with counsel and

15    Mr. Rodrigues yesterday.  Mr. Rodrigues indicated his desire to

16    waive jury.  The Court informed him of his rights, explained

17    the difference between a jury trial and a trial before a judge

18    alone.

19         Mr. Rodrigues indicated an understanding and a

20    willingness, and filled out a form, signing it and

21    memorializing his decision to waive jury.  I assume that that

22    is still his desire to go forward in the court trial today?

23         MS. LOPEZ:  Yes, Your Honor.

24         THE COURT:  Okay.  How do you wish to proceed,

25    Ms. Williams?

1          MS. WILLIAMS:  Your Honor, we've submitted stipulated

2    facts that the parties drew up together.  We also have 12

3    exhibits that are included in that stipulation.  We've provided

4    a folder for the Court.  I have another copy if you would like.

5    And then there are two exhibits, one --

6          THE COURT:  Oh, I have it.  Yeah.

7          MS. WILLIAMS:  One is the video recording of

8    Mr. -- Mr. Rodrigues-Barios's entry into the United States on

9    the remote video surveillance system.  And the other is a video

10   of his post-arrest statement.  That's been provided along with

11   an English translation of that Spanish language interview, Your

12   Honor.

13         THE COURT:  All right.  Do you have the mechanism to

14   play those?

15         MS. WILLIAMS:  I do, Your Honor.

16         THE COURT:  If you'll give me just a minute, I think

17   what I'd like to do is look at the stipulated facts first.

18         MS. WILLIAMS:  That's fine, Your Honor.

19         MS. LOPEZ:  That's fine.

20         THE COURT:  And then I'll hear further from counsel.

21         All right.  I have read and understood the stipulated

22   facts, Ms. Williams, do you want to -- they refer to several

23   exhibits, some of which, I assume, are the two videos you

24   mentioned.  You may play those now, if you want.

25         MS. WILLIAMS:  Yes, Your Honor.  I'll start by playing

1  the RVSS video footage, Your Honor.  And this is the video

2  footage from May 22nd, 2020, at approximately 5:38 in the

3  morning.

4          (Video played.)

5          THE COURT:  Is that smoke or dust?

6          MS. WILLIAMS:  It's the dust, Your Honor.

7          (Video played.)

8          MS. WILLIAMS:  And that's the end of that particular

9  video, Your Honor.

10          Would the Court like to see the -- now, the video of

11  the sworn statement?

12          THE COURT:  Please.

13          (Video played.)

14          THE COURT:  Ms. Williams, can you pause this for just

15  a minute?

16          MS. WILLIAMS:  Yes, Your Honor.

17          THE COURT:  I'm assuming this whole thing is not in

18  Spanish.

19          MS. WILLIAMS:  Your Honor, it is, actually.  We did

20  provide the translation as well.  I apologize.

21          THE COURT:  Oh, okay.  I don't speak Spanish, so

22  there's no point in me watching the video, I suppose.  The

23  translation is which exhibit?

24          MS. WILLIAMS:  The translation is Exhibit Number 10,

25  Your Honor.

1          THE COURT:  All right.  Well, let me just review that,

2     as I said, since I don't speak Spanish.  With the interpreters,

3     a little bit, maybe, un poquito.

4          All right.  I have reviewed the transcript.  Give me

5     just a minute to go over the other exhibits.

6          All right.  I have reviewed all of the exhibits.  Is

7     there anything else you wish to offer, Ms. Williams, on behalf

8     of the United States?

9          MS. WILLIAMS:  Just briefly, Your Honor.  Thank you.

10          Briefly, Your Honor, the United States has proven the

11     elements of this case beyond a reasonable doubt.  We have

12     proven that on May 22nd, 2020, the defendant, Manuel

13     Rodrigues-Barios was an alien, he was not a citizen of the

14     United States.  He does admit that in his post-arrest

15     statement, Your Honor.  His manner of entry also shows that.

16          We also admitted the prior plea agreement showing his

17     admission that he was not a citizen of the United States and,

18     in fact, an alien, Your Honor.  And in the stipulation, he also

19     agrees to those same facts, and that he's a native of Mexico.

20          We also proved beyond a reasonable doubt that he was,

21     in fact, removed from the United States when there was a

22     pending removal order, or an outstanding removal order.  That

23     was the administrative removal.  We admitted documents showing

24     the notice of intent to issue a final administrative order of

25     removal.  We showed the actual administrative removal order and

the conviction documents associated with that administrative
removal.  Defendant also admitted that he had not applied for
permission to reapply for entry into the United States.

          Again, we think the issue here would have been the
fact -- whether or not the defendant had the specific intent to
enter the United States free from official restraint and
without consent.

          Here the video shows Mr. Rodrigues-Barios coming down
the fence at 5:38 in the morning, Your Honor.  You can see the
lights go on there on the light post there.  You also see that
when he comes down the fence, he briefly attempts to climb back
up the fence, Your Honor.

          He was not trying to get caught in this case.  When we
look at where he entered, he entered just one mile west of the
Calexico port of entry, behind the outlet mall early in the
morning.  He goes down over that fence.  And you can see the
fence there, and see the barbed wire at the top of that fence.

          THE COURT:  Hasn't he stipulated to that?

          MS. WILLIAMS:  Yes, he has stipulated to that, Your
Honor.  I just wanted to make a complete record.

          THE COURT:  That's paragraph 10, right?

          MS. WILLIAMS:  Correct, Your Honor.

          THE COURT:  He would know best, and he admits that he
entered with the conscious desire to get past the border and to
travel north to Los Angeles?

1        MS. WILLIAMS:  He has, Your Honor.

2        THE COURT:  May I ask you the information on the

3    second page alleges also that he was removed from the United

4    States after August 12th, 2019.  I don't see -- maybe I missed

5    it.  I don't see the documents that show he was removed after

6    that date.  The dates that I see are in April and May of 2019,

7    not August.

8        MS. WILLIAMS:  Correct, Your Honor.  The removal form

9    for -- well, first, Your Honor, to the extent the defendant did

10   stipulate to being removed from the United States after that

11   date.  The verification of removal that you see in there, I

12   believe that's Exhibit Number 7, it does show that he entered

13   on May 10th, 2019.  That is the verification form that's

14   associated with -- with that particular -- with that removal,

15   so --

16       THE COURT:  Where is it in the stipulation that he

17   admits that he was deported after August 11th, 2019 -- August

18   12th, 2019?

19       MS. WILLIAMS:  So that would be on page 3, paragraph

20   8.  He did admit that he was deported on August 14th, 2019.

21       THE COURT:  Okay.  There's no document, though,

22   pertaining to that removal?

23       MS. WILLIAMS:  That is Document Number 7, Your Honor.

24   So --

25       THE COURT:  Oh, I was thrown off, I think, by the date

1   May 10th on that.

2   　　　　MS. WILLIAMS:  May 10th was the date that that

3   document would have been initiated as to the date that he

4   entered the United States.

5   　　　　THE COURT:  So I turn the page, I see that he's put

6   out Calexico port of entry.

7   　　　　MS. WILLIAMS:  Correct.

8   　　　　THE COURT:  By foot.  But where's the date of the put

9   out?

10  　　　　MS. WILLIAMS:  So the date of the put out is not on

11  that particular form.

12  　　　　THE COURT:  Is there an exhibit that has the date of

13  the put out?  I notice that another form relating to an earlier

14  put out did have the date on it, and showed when he was put

15  out.

16  　　　　MS. WILLIAMS:  No, Your Honor.  There is no date on

17  that form.  There's no date on a form in his A-file that states

18  that he was removed on August 14th, 2019.

19  　　　　THE COURT:  See, if you look back to 4, you'll see

20  what I'm talking about.  Turn to page 2, it says, SYS, which I

21  understand to mean San Ysidro, afoot, 4/11/2019, do you see

22  that?

23  　　　　MS. WILLIAMS:  Yes, Your Honor.

24  　　　　THE COURT:  But you're saying that as to the put out

25  alleged in the information, there's no official document that

1   indicates that, though the defendant has admitted it in his

2   stipulated facts?

3         MS. WILLIAMS:  Your Honor, give me one second.  I did

4   not admit that as an exhibit, but give me one second.

5         (Discussion off the record.)

6         MS. WILLIAMS:  So, Your Honor, we can admit as Exhibit

7   Number 13 --

8         THE COURT:  I'm -- you can if you want.  I mean, I'm

9   not trying to tell you how to try your case.  I'm just saying I

10  didn't see documentation.  Everything else appears to be

11  documented that pertains to the stipulations, but I didn't see

12  the date of the put out there.

13        MS. WILLIAMS:  I understand, Your Honor.  The agent

14  who signed on that form did not include the date.  But I do

15  have, in this copy of the certified blue sheeted documents, a

16  document showing that put out date, Your Honor.

17        And I'd like -- if the Court would permit, I'd like to

18  introduce that as Exhibit Number 13, Your Honor.

19        THE COURT:  All right.  Show it to counsel first.

20        MS. WILLIAMS:  Sure.  Permission to approach, Your

21  Honor?

22        THE COURT:  Yes, of course.  I assume there's no

23  objection to Government's 13.

24        MS. LOPEZ:  No objection, Your Honor.  Thank you.

25        (Government's Exhibit 13 was received in evidence.)

```
 1              THE COURT:  All right.  13 is admitted also.

 2              Anything else, Ms. Williams?

 3              MS. WILLIAMS:  Your Honor, we would just -- we would

 4    just wrap up by stating that the defendant has also stipulated

 5    to the remaining elements that he has, in fact -- he has not

 6    applied for permission to reenter the United States, Your

 7    Honor.

 8              With that, the United States would submit, unless the

 9    Court has any questions.  And --

10              THE COURT:  All right.  Let me hear from defense

11    counsel, any rebuttal or anything you want to offer?

12              MS. LOPEZ:  No, Your Honor.  We have stipulated to the

13    facts as presented by the government.

14              THE COURT:  All right.  The Court has reviewed the

15    stipulated facts, the stipulations entered into on behalf of

16    the defendant by his counsel.  The defendant has also signed

17    the stipulation.

18              I assume that this was translated for the defendant

19    before he signed the last page of the stipulations, Ms. Lopez?

20              MS. LOPEZ:  That's correct, Your Honor.  I reviewed

21    the document with Mr. Rodrigues in Spanish.

22              THE COURT:  All right.  I agree with the government's

23    characterization that all of the elements are included within

24    the stipulated facts.  It appears to me that on the date

25    charged in the indictment, May 22nd, 2020, that the defendant
```

attempted to make entry into the United States.  The video
shows what appears to be a rope.  He somehow scaled the barbed
wire and then came down the rope.

At the time he came down, it looked like a Border
Patrol vehicle was sitting right there.  That's the white car.
I assume it's a Border Patrol vehicle, because it was very
close to the fence.

The driver of the car acted immediately.  It was hard
to see for a while exactly what was going on, but when the dust
cleared, one could clearly see that there were two people or
more outside the automobile.  The defendant was being
encountered by the Border Patrol.  And that leads to the other
facts, and the defendant's ultimate arrest and then the
statement that he made.

It's clear to me that the defendant took a substantial
step toward entering the United States by coming over the
border.  There's no equivocation about that.  He's in the
United States.  It's clear to me from the stipulated facts in
the documents that the defendant had no permission as of May
22nd to enter the United States.

Also clear is the defendant has admitted, and the
documents show that he was not a citizen, naturalized or born
here.  He was, therefore, an alien as that term is defined
under federal immigration law.

The question is, when one is caught close to the

1  border like that, sometimes people come close to the border to

2  give themselves up.  It would be unusual for one to have to

3  scale a barbed wire fence and scale down on a rope to give

4  himself up.  If, for example, he was applying for asylum, one

5  would expect he'd go to the port of entry, and just walk up and

6  turn himself in.

7         So the circumstantial evidence corroborates the

8  defendant's statement that his conscious desire was to get past

9  the border fence and to travel to Los Angeles.

10        The government's alleged that the defendant was last

11 removed sometime after August 12th, 2019.  The defendant has

12 admitted that in his statement, but his admission is

13 corroborated also by the last exhibit offered by the

14 government, Exhibit 13.  It corroborates that on August 14th,

15 two days after the date alleged that the defendant was

16 physically removed from the United States.

17        So the Court finds, beyond a reasonable doubt, that

18 is, I am firmly convinced based on the uncontested evidence

19 that the defendant committed all of the elements of the crime

20 of attempted illegal entry into the United States, that he

21 admits and the circumstances corroborate that he had the

22 required intent at the time he entered.

23        I find that there was a union of act and intent, that

24 is, the intent was formed as he was crossing, and he had that

25 intent as he dropped down into the United States using the

1    rope.

2         Accordingly, I find, beyond a reasonable doubt, the

3    defendant is guilty of the charge in count 1 of the

4    information.  I adjudicate him guilty at this time.

5         Let me ask Ms. Lopez about the pending revocation.

6    The defendant is on supervised release.  Actually, he's on

7    probation.  I placed him on probation in July of 2020.

8         MS. LOPEZ:  2019, Your Honor.

9         THE COURT:  I'm sorry, 2019.  And I set two conditions

10   on probation.  One, he was not to return to the United States

11   without permission of the United States Government.  The other,

12   he was not to violate any United States law.  Do you have any

13   evidence to offer on the allegations in the petition?

14         MS. LOPEZ:  No, Your Honor.

15         THE COURT:  I'm assuming that the government is

16   relying on the same evidence in support of the allegations that

17   the defendant violated probation?

18         MS. WILLIAMS:  Correct, Your Honor.

19         THE COURT:  All right.

20         So the Court takes notice of the same things.  I take

21   judicial notice of the docket in case 19-CR-2118.  I do find

22   that the defendant has violated the condition of returning to

23   the United States without permission, and I find that he's

24   committed a new offense against the United States in that he 's

25   violated Title 8, Section 1326(a) and (b).  So he is in

1    violation of supervised release as well.

2            So, Ms. Lopez, what's your pleasure here?  Do you want

3    a probation report or -- it doesn't seem like much time has

4    passed.  His record is probably the same as what was outlined

5    in the -- let's see.  Was there a probation report in the other

6    case?

7            MS. LOPEZ:  There was not, Your Honor.

8            THE COURT:  He got -- he was sentenced during the

9    COVID period?

10            MS. LOPEZ:  He was not.  He was sentenced several

11    months before --

12            THE COURT:  Oh.

13            MS. LOPEZ:  -- COVID.  So he -- he received at that

14    time a sentence of five years probation, and he had served

15    three months in custody.

16            THE COURT:  I see.

17            MS. LOPEZ:  And so for that reason, there was no

18    presentence report prepared.

19            THE COURT:  So the only thing I have is in the old

20    file, the one for which he's on probation, is a criminal

21    history report.  And it indicates that he was convicted of

22    violation of Section 422(a) of the California Penal Code

23    threatening a crime.  And he got 28 months in prison.

24            I don't think that was contested at the time he was

25    sentenced.

1          MS. LOPEZ:  No, and, Your Honor, that was admitted in

2   the stipulated facts today, so --

3          THE COURT:  Okay.  Does he have any record beyond that

4   and the previous --

5          MS. LOPEZ:  No.

6          THE COURT:  -- 1326?

7          MS. LOPEZ:  He just has those two prior offenses, Your

8   Honor.  I think that the government and I would agree as to

9   that.

10          THE COURT:  All right.  Do you want a probation report

11   in this case?  He's entitled to have one.  I don't necessarily

12   need it, not much as changed, other than we have another 1326

13   violation.

14          MS. LOPEZ:  Then, Your Honor, we'd be prepared to

15   waive the PSR.

16          THE COURT:  Okay.

17          The other question is, I don't have information in

18   this criminal history report regarding his immigration history,

19   criminal immigration history.

20          I know from the documents, he's been deported a number

21   of times.  How many -- is there any consensus on how many times

22   he's been put out of the United States, whether by deportation

23   or voluntary return, or whatever nomenclature is used to

24   describe a kickout.

25          MS. WILLIAMS:  To my knowledge, Your Honor, he just

1    has the two.

2         MS. LOPEZ:  That's correct, Your Honor.  He has the

3    two.

4         MS. WILLIAMS:  April of 2019 and August of 2019.

5         THE COURT:  I thought there was another one.  Again, I

6    may be looking at the wrong documents.  I thought there was one

7    in May, too, but --

8         MS. LOPEZ:  They often will prepare the documents,

9    Your Honor, so I believe that that was from 2019, in which they

10   prepared the notice of intent to reinstate.  And then they

11   effectuated the actual reinstatement after he had been

12   sentenced by this Court in August.

13        THE COURT:  I see.  Okay.  The parties agree, then,

14   that he's been deported twice.

15        MS. WILLIAMS:  Yes, Your Honor.

16        MS. LOPEZ:  That's correct, Your Honor.

17        THE COURT:  Once in 2019 -- or twice in 2019, is that

18   what it is?

19        MS. WILLIAMS:  Twice in 2019, Your Honor.

20        THE COURT:  April and then August?

21        MS. WILLIAMS:  Correct, Your Honor.

22        THE COURT:  Okay.  I'm not sure what his guidelines

23   would be here.  Have you done guideline calculations if we go

24   forward with sentencing today?

25        MS. LOPEZ:  Your Honor, I have done his guidelines

1  calculations.  I hadn't anticipated, I apologize, that we'd go

2  forward today.  We could go forward today if the Court --

3  THE COURT:  It's up to you and him.  You know, he has

4  the right -- you said he doesn't want to have a probation

5  report prepared.  I'm happy to do that, but I'll also accept

6  his decision.  And if he wants to waive the probation report,

7  we can do that.

8  MS. LOPEZ:  I can talk with him briefly right now,

9  Your Honor.

10  THE COURT:  Okay.  All right.

11  MS. LOPEZ:  And just check.

12  (Discussion off the record.)

13  THE COURT:  Have you figured it out?

14  MS. LOPEZ:  Yes, we have.

15  THE COURT:  Okay.  Is there agreement on what the

16  starting offense level is?

17  MS. WILLIAMS:  There is, Your Honor.

18  MS. LOPEZ:  There is, Your Honor.

19  MS. WILLIAMS:  If we can just have a quick moment,

20  Your Honor, we are trying to determine -- we just established

21  that -- what the base offense level is, and what the specific

22  offense characteristics are, in that the defendant would be

23  eligible for the acceptance of responsibility, the minus two.

24  THE COURT:  Yeah.

25  MS. WILLIAMS:  What is not as clear is whether or not

```
1   he would be eligible for the third point, so --

2           THE COURT:  You have to decide that, but he saved

3   everybody a lot of time.  I don't know why he wouldn't get

4   that.

5           MS. LOPEZ:  I had been prepared to -- sorry, to argue

6   that he should be given the third point, but I wasn't

7   anticipating we'd go forward with sentencing today.

8           THE COURT:  You know how that works, though.  They

9   have to recommend the third point.  I have discretion to give

10  the two, and I would give it, in light of the substantial

11  saving of time.

12          Look, everybody is entitled to contest an accusation

13  against them.  There's no trial penalty to be imposed,

14  particularly by me.  I think Federal Defenders office knows

15  that.  So I would give him the two levels for accepting

16  responsibility that -- the stipulation --

17          MS. WILLIAMS:  We'll make the motion --

18          THE COURT:  -- certainly makes clear that he admitted

19  every element.  And I looked at his post-arrest statement and

20  it appears that he made threshold statement of guilt, too.

21          MS. WILLIAMS:  Your Honor, we'll make a motion for the

22  third point, Your Honor.

23          THE COURT:  Okay.  The Court is inclined to give him

24  that.  So what's the starting offense level?

25          MS. LOPEZ:  It's an 8, Your Honor.
```

1          THE COURT:  8?

2          MS. LOPEZ:  Yes.  For the base offense level in the

3  1326.

4          THE COURT:  So he'd only get two points off, then,

5  right?

6          MS. LOPEZ:  No, I'm sorry, 8 plus 8 plus 4.

7          THE COURT:  Oh.

8          MS. WILLIAMS:  So 8 plus 8 for the criminal threats

9  conviction, plus 4 for the prior 1326.

10          THE COURT:  So it's 20?

11          MS. LOPEZ:  20.

12          THE COURT:  And reduced by three?

13          MS. WILLIAMS:  Yeah, reduced by three.

14          THE COURT:  So 17?  What criminal history category is

15  he in?

16          MS. LOPEZ:  He is in category III, he has six points,

17  so he has three points for the prior 422, one point for the

18  prior 1326, two points because he's on supervision, he's on

19  probation.  So he has six criminal history points, he's in a

20  category III.

21          THE COURT:  The guidelines say 30 to 37 months.

22          MS. LOPEZ:  That's correct, Your Honor.

23          THE COURT:  All right.  I'm happy to -- are you

24  prepared to go forward, then?

25          MS. LOPEZ:  Yes, Your Honor.

1      THE COURT:  All right.  I'm happy to hear from you.

2      MS. LOPEZ:  Thank you.  Let me just -- if I just can

3  have a moment.

4      So, Your Honor, I think this is a case in which the

5  Court should take into consideration the fact that the

6  guidelines now are substantially higher than they were when

7  Mr. Rodrigues was prosecuted in 2019.

8      At that time, he received a sentence of five years

9  probation.  The government recommended six months in custody.

10  That was with Fast Track points at that time.  And the Court

11  ultimately gave him the five years probation after

12  Mr. Rodrigues had served three months in custody.

13      So he has served -- before this, three months.  And

14  then his guidelines are substantially higher now because both

15  the criminal history category is increased, and then he

16  receives an additional four points for the prior 1326.

17      So now he's in a situation where the low end of the

18  guidelines is -- I'm terrible at math.  My husband routinely

19  makes fun of me, but I think that's 10 times higher than what

20  he received back in 2019.  And I think that, Your Honor, that

21  is substantially above what the Court should impose to both

22  punish Mr. Rodrigues and to deter him.

23      You know, I was speaking with him briefly before Court

24  this morning.  And he -- we talked about how much -- we talked

25  about how much more difficult it was to serve the past -- he's

1    been in custody now for just over 13 months.  And this has been

2    an extremely difficult year.

3          You know, leaving aside COVID as it applies directly

4    to Mr. Rodrigues, it does appear that he did come down with

5    COVID in custody.  He was part of a unit in El Centro that --

6    where there were people that tested positive.  He came down

7    with the symptoms.  He had fever, chills, but his whole unit

8    was cohorted, and they didn't test everybody.  So, you know,

9    it's unclear that he definitely contracted COVID.

10          It seems like he probably did, but leaving that aside,

11    you know, serving time in custody, and I've heard this both

12    from Mr. Rodrigues, but also from other clients, has just been

13    a lot more difficult.  There's been less movement.  Less

14    ability to access recreational time, programming, jobs.

15    They've been confined to their cells a lot more and for longer

16    periods of time.

17          And so I think that's a factor that the Court would

18    take into consideration.  I'd ask the Court to take that into

19    consideration, that these past 13 months have been more

20    difficult than they otherwise would be under normal

21    circumstances.

22          And Mr. Rodrigues, you know, he did serve the -- he

23    served, I think, half time on the 422, but he served a period

24    of time in custody.  And he --

25          THE COURT:  Did you ever see the police reports

1    relating to that conviction?

2            MS. LOPEZ:  I didn't, Your Honor.  I've only seen

3    the --

4            MS. WILLIAMS:  We have not, Your Honor.

5            MS. LOPEZ:  -- conviction documents presented by the

6    government.

7            THE COURT:  Yeah.  He got a stiff sentence, which

8    makes me think it was, you know, something more than threats.

9    The state court, in my experience over the last several years,

10   is very, very lenient in sentences.  And when a guy gets, for a

11   first conviction, 28 months in prison, it signals to me that

12   it's something more than just conveying a threat.

13           MS. LOPEZ:  I don't have any --

14           THE COURT:  That's why I ask that.

15           MS. LOPEZ:  I don't have any additional information,

16   Your Honor.

17           And I understand the Court's concern with that.  It is

18   his only prior felony, aside from the immigration offense.  And

19   not to say that -- you know, I understand the Court's also

20   concerned with a person who is convicted of illegal reentry,

21   and then returns while on supervision, but he only has the one

22   state prior.

23           THE COURT:  You represented him in the earlier case,

24   too?

25           MS. LOPEZ:  I did, Your Honor.

1    THE COURT:  Is there anything in your file pertaining

2  to that?  Because it seems to me, just as it's curious to me

3  now, it would have been curious to me at the time that I put

4  him on probation, and gave him just three months.

5    I mean, I must have been convinced that it wasn't as

6  bad as it looks on paper.

7    MS. LOPEZ:  I don't have any other information, Your

8  Honor.

9    THE COURT:  And nothing in your file at all,

10  Ms. Williams, about the nature of the event that gave rise to

11  that conviction and 28-month prison sentence?

12    MS. WILLIAMS:  No, Your Honor, just what you see in

13  the criminal history report.  What it was originally charged

14  as, Your Honor.

15    THE COURT:  Have you asked him about that, Ms. Lopez?

16  I don't want to intrude on your attorney-client communications,

17  but I'm -- I'd like to know.  In fact, it seems almost

18  irresponsible to go forward without knowing what the nature of

19  that was, given that it's recent.

20    It's not something that I can just write off and say,

21  well, this happened 10 years ago or 15 years ago, it's old

22  history.  A lot of times, these arise in domestic violence

23  situations.

24    I see that, apparently, there was some minor involved.

25  That was one of the dismissed charges.  So I'm very curious as

1   to what that is.  Obviously, you know, that could influence the

2   determination of whether he's a dangerous person and affect the

3   deterrence metric a little bit.

4          MS. LOPEZ:  Your Honor, I don't have any additional

5   information.

6          THE COURT:  Oh.  And you don't -- you can't proffer

7   anything based on conversations with him about the nature of

8   that?

9          MS. LOPEZ:  No.

10          THE COURT:  Okay.

11          MS. LOPEZ:  But it is just -- he has just the one

12   prior.  And so, you know, and I think he -- I can proffer that

13   he served half of that amount of time.

14          So I understand the Court's concern with that.  I do

15   think when there's, you know -- you know, more serious

16   offenses, we do see sentences imposed that are longer than

17   this.  I don't think --

18          THE COURT:  Do you want to inquire of him at all and

19   just kind of give me the gist of it?  I'm very, very curious.

20   As I said, I'm a little reluctant now, having suggested we can

21   go forward today, to go forward without, you know, knowing what

22   that was about.

23          I was -- many, many years ago, I was a state

24   prosecutor.  That's where I started my career.  And, you know,

25   there was a difference in that offense and many offenses

between people who got, like, local time in county jail, and then those that went to prison. And there was a clear line of delineation in terms of how serious the offense was.

You know, some of these offenses can be so-called wobblers, and they can treat them as misdemeanors. I don't know about 422. But criminal threats come in all different categories. And as I said, just making a threat, whether in person or over the phone, or by mail, or something seems really inconsistent with what I've come to expect from the state courts, that if that was the nature of it, somebody would have been sent to prison.

I rather think that would have been handled, you know, as a misdemeanor, or locally or something. But if you can just, you know, give me an idea. Otherwise, maybe we can put this over. And as I said, this is 2018. It would be easy enough to get the documentation, but I -- if it seems credible, I'm willing to accept the defendant's account.

MS. LOPEZ: Okay.

THE COURT: No requirement that you do that. Only if you and he decide that it's in his interest.

MS. LOPEZ: So, Your Honor, after briefly conferring with him, what I can proffer is that this was a verbal dispute that occurred after he was leaving work one day. He had been drinking. And he didn't know the other individual.

The person who was, I guess, a minor was with the

1  other individual. There was no, like, physical encounter, but

2  they did have like a verbal altercation that resulted in this.

3          And I don't --you know, without seeing the reports,

4  like, but that it was -- involved somebody that he didn't know.

5  And it was a dispute where he had been under the influence of

6  alcohol. It occurred outside of, I think, his place of

7  employment or --

8          THE COURT: It looked like there was some kind of

9  weapon involved, too, because there was an ADW, not firearm

10  charge that was dismissed also. Was he armed with some kind of

11  weapon at some point?

12          MS. LOPEZ: I don't -- he doesn't recall that that was

13  the case.

14          THE COURT: Oh.

15          MS. LOPEZ: So --

16          THE COURT: Okay.

17          MS. WILLIAMS: Just briefly, Your Honor, the documents

18  state that there was a knife involved.

19          THE COURT: What documents now?

20          MS. WILLIAMS: Well, it's just the court notes.

21          THE COURT: The what?

22          MS. WILLIAMS: The court notes? The court notes from

23  the hearing. And the --

24          THE COURT: From the hearing on the state case?

25          MS. WILLIAMS: Yes, Your Honor.

1          THE COURT:  You have those?

2          MS. WILLIAMS:  I have those.  Ms. Lopez has them as

3   well, I believe.

4          MS. LOPEZ:  I have, like, the complaint and -- I have

5   a complaint that was filed.

6          THE COURT:  Oh, okay.  Can you read me what the

7   complaint says as to count 3?

8          MS. WILLIAMS:  Yes, Your Honor.  So count 3 is the

9   crime of child molesting in violation --

10          THE COURT:  Oh, that's not it, then.  The 422, I

11   thought that was count 3.

12          MS. WILLIAMS:  So the charge, the assault with a

13   deadly weapon charge just states that --

14          THE COURT:  No, not that one either.  It looks like he

15   pled --

16          MS. WILLIAMS:  To count 2.

17          THE COURT:  Okay.  Well, the criminal history report

18   is wrong, then, because it lists the charges as follows, count

19   1, 245(a), count 2, 6476, which is knowingly molest a minor,

20   count 3 is 422PC.  And then when I look at the imposed -- date

21   sentence imposed/disposition, it says he pled guilty to count

22   3, which is the -- corresponds to the 422 charge.

23          You say the charging paper is different?

24          MS. WILLIAMS:  Yes, it's -- and I'm not sure.  This is

25   just the felony complaint.  I don't know if they filed a felony

1  information and they later rearranged the charges.

2  Count -- what he pled guilty to was the 422(a).  The original

3  charges do include the annoy, molest, and the assault with a

4  deadly weapon.

5        THE COURT:  So what's alleged as to the 422(a) in the

6  felony complaint?

7        MS. WILLIAMS:  Sure.  In the County of Los Angeles,

8  the crime of criminal threats in violation of Penal Code

9  Section 422(a), a felony was committed by Manuel

10 Rodrigues-Velez [as spoken], who did willfully and unlawfully

11 threaten to commit a crime which would result in death and

12 great bodily injury to another individual with the specific

13 intent that that statement be taken as a threat.

14       THE COURT:  Okay.  All right.  So nothing in the

15 language of the complaint that suggests he acted on it, then,

16 right?

17       MS. WILLIAMS:  Not that I can see, Your Honor.

18       THE COURT:  Okay.  All right.  Well, I guess surprises

19 occur every day.  I'd be very surprised that a state judge

20 would have sent somebody to prison for making a threat to a

21 couple of people, particularly a guy that's drunk.  But go

22 ahead.

23       MS. LOPEZ:  Some judges are, you know, harsher

24 sentencers than other judges.

25       THE COURT:  Really?  Not around here, I don't think,

 1  but over in state court, there's a lot of difference.

 2       MS. LOPEZ:  I would imagine.  I haven't practiced in

 3  state court, Your Honor, but I would imagine that there's some

 4  variety or some, you know, range.

 5       THE COURT:  Yeah.  Huh.

 6       Anyway, go ahead.

 7       MS. LOPEZ:  So, well, Your Honor, the other piece that

 8  I would -- so, you know, he has the one state prior.  He has

 9  the illegal reentry offense in front of this Court.  And then

10  he has returned, and is back in the same situation now, but

11  with a far greater potential sentencing, both with the

12  guidelines on the new 1326, and then the probation revocation.

13       And I think that this has chastened him.

14       THE COURT:  Does he have family in the United States?

15       MS. LOPEZ:  He really doesn't have family here.  He

16  has very minimal family, Your Honor.  I shouldn't say that.

17  I'm sorry, I apologize.  He has a daughter that he has had

18  almost no contact with.

19       THE COURT:  Oh.

20       MS. LOPEZ:  But I think that was one of the motivating

21  factors.

22       THE COURT:  Is she in Los Angeles?

23       MS. LOPEZ:  She's in Los Angeles.

24       THE COURT:  What was the other motivating factor, was

25  he out of work?

1          MS. LOPEZ:  The other motivating factor, Your Honor,

2     is that Mr. Rodrigues grew up just in a kind of extreme poverty

3     that I don't think either you or I can really contemplate.

4          He's from a rural community in Zacatecas.  And his

5     parents were subsistence workers, so they grew beans and

6     rice -- or beans and corn, and ate what they could produce.

7          So, you know, in talking with him about, like, what

8     were the economic opportunities, there really weren't any in

9     his community in the place where his parents still live.

10          They have, you know, like, a cement block floor.  No

11     indoor plumbing.  No indoor water.  They walk 10 minutes to

12     haul water from a well.  And so, you know, that was the

13     motivating factor originally when he came to the United States.

14     He had an aunt who lives in Los Angeles.  And he was seeking

15     really a better life for himself and for his family to be able

16     to have some economic opportunity.  And I understand that, you

17     know, that doesn't give him permission to just cross the

18     border.

19          THE COURT:  Right.

20          MS. LOPEZ:  But, you know, he's in a situation where

21     there's just like almost no options for him.

22          THE COURT:  How long had he been in Los Angeles when

23     he was arrested on the threats charge?

24          MS. LOPEZ:  He came -- he came to the United States

25     in -- when he was 20.  He's 29 now.  So it had been --

THE COURT:  He'd been in for a long time, apparently

working.  You say he was coming out of work when he got into

the altercation?

MS. LOPEZ:  He was coming out of work, yeah.  He had

been here for at least, I think -- that would be six -- about

six years.

THE COURT:  And where did he work in LA?  What was the

nature of his work?

MS. LOPEZ:  He has done a number of different types of

jobs.  I think he's kind of done whatever.  He's worked as a

gardener.  I think at that time he was working in a restaurant.

Is that right?  Okay.

You know, he's -- back in Mexico, he started working

as a subsistence worker when he was young, helping his family

produce food to eat.  And like I said, they grew beans and

corn.  They had chickens, they had some animals.  And, you

know, he had some extended family in Los Angeles.  And so he

ended up coming to LA, to try to find some economic opportunity

for him and his family.

His brothers, he has two brothers, they both remain in

Zacatecas.  And then --

THE COURT:  Go ahead.

MS. LOPEZ:  His parents and his brothers both live

back in Mexico.

THE COURT:  His parents are alive, and his brother

1    is -- they're all back in his hometown?

2          MS. LOPEZ:  And they all work in the fields, so they

3    were really looking to Mr. Rodrigues as a source of --

4          THE COURT:  What's your recommendation here,

5    Ms. Lopez, for the new charge?

6          MS. LOPEZ:  Your Honor, I think altogether the Court

7    should impose a sentence of 18 months.  I would ask for this

8    sentence to be -- he's been in custody now 13 months.  So I'd

9    ask for a time served on this case with three months

10   consecutive on the revocation of probation.

11         THE COURT:  That only amounts to 16 months.

12         MS. LOPEZ:  Oh, I'm sorry.  See, I'm terrible about

13   math, right?  Well, then I would ask for a sentence of 16

14   months, with three months consecutive.

15         I think that, you know, this has been a sobering kind

16   of -- when I first went to see him -- well, I didn't go to see

17   him, I spoke with him on the phone because he was in custody in

18   El Centro, and it was the middle of COVID.  And I couldn't get

19   in.

20         But with talking to him about the guidelines and this

21   sort of very -- far greater severity of consequence in

22   returning at this point.  You know, I think that was very

23   sobering and shocking to him and unexpected.

24         And then, you know, doing -- serving the past 13

25   months in custody under the stringent restrictions on movement,

1   on ability to work, and do all of the things that really do

2   allow a person to have some semblance of a life while in

3   custody.  It's not like, I think, you know, anything like when

4   they're not in custody.

5           But, you know, there's opportunities to exercise and

6   to work and to, you know, go to programs.

7           THE COURT:  Sure.

8           MS. LOPEZ:  He hasn't had the opportunity to do any of

9   those things.  And I think that means that custody has been far

10  greater -- far more difficult.  And the Court should take that

11  into consideration.

12          THE COURT:  All right.

13          MS. LOPEZ:  And so for those reasons, Your Honor, I'd

14  ask the Court to follow my recommendation.

15          THE COURT:  Thank you.  Let me hear from

16  Mr. Rodrigues.  Mr. Rodrigues, you have an opportunity to speak

17  and tell me what you want me to know before I make a judgment

18  on what the sentence should be.  I'm happy to hear from you.

19          THE DEFENDANT:  I just want to remain in Mexico in

20  order to stay with -- united with my family, because

21  here -- being here in prison is not a life.

22          THE COURT:  All right.

23          After you were deported the last time in August of

24  2019, did you go home?

25          THE DEFENDANT:  No, I stayed here on the border.

1          THE COURT:  In Tijuana?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Did you have a job in Tijuana?

4          THE DEFENDANT:  Very little.

5          THE COURT:  Okay.  All right.  Well, do you remember

6     when you were in front of me the first time?

7          THE DEFENDANT:  Yes.

8          THE COURT:  I don't have a transcript of what was

9     said, but I know my habit and my custom when I put somebody on

10    probation for this offense, I elicit from them -- I ask them to

11    give me a promise that they won't come back.  Do you remember

12    or did I ask you to promise me that you wouldn't come back?

13         THE DEFENDANT:  Yes.

14         THE COURT:  And what did you say?

15         THE DEFENDANT:  That I promised.

16         THE COURT:  Okay.  So tell me what led you at this

17    particular time, then, to break the promise and come over, what

18    were the circumstances?

19         THE DEFENDANT:  Well, there was no work.  And to be

20    with my family on this side.

21         THE COURT:  Okay.  Your lawyer told me you have a

22    daughter, but you seldom have contact with her.  Who are you

23    talking about when you say your family?

24         THE DEFENDANT:  Well, my family, my spouse.

25         THE COURT:  Do you have a wife here in the United

1    States, too?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Where is she, in Los Angeles?

4              THE DEFENDANT:  Los Angeles.

5              THE COURT:  This is the mother of your daughter?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Are you -- are you legally married to her?

8              THE DEFENDANT:  No.

9              THE COURT:  Okay.  But you resided with her for a

10   period of time?

11             THE DEFENDANT:  Yes.

12             THE COURT:  And your relationship is still good with

13   her?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Did your wife and daughter come visit you

16   while you were staying in Tijuana for the roughly a year?

17             THE DEFENDANT:  No, they haven't gone there.

18             THE COURT:  Okay.  Were you in contact with them by

19   telephone or otherwise?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Your lawyer must have misunderstood you,

22   because she didn't think you were in touch with your daughter

23   anymore.  Are you still in touch with your daughter?  When

24   you're here or when you were here, did you see her?

25             THE DEFENDANT:  No, I have not called her from here.

1    THE COURT:  No, I understand.  Before you were

2  deported, after you were convicted of the crime in LA, were you

3  living with your -- the mother of your child and your daughter,

4  were you living with them?

5    THE DEFENDANT:  Yes.

6    THE COURT:  And how long had you -- your daughter is

7  what, six years old, you said?  I think your lawyer told me

8  she's six.  Is that her age?

9    THE DEFENDANT:  She's four.

10    THE COURT:  Oh, four, okay.  And did you live with the

11  mother of your child and your daughter up until the time you

12  were arrested on the state charge?

13    THE DEFENDANT:  Yes.

14    THE COURT:  Okay.  All right.  Anything else you want

15  me to know?

16    THE DEFENDANT:  No, only to apologize for once again

17  being here.

18    THE COURT:  Okay.  Thank you.  Ms. Williams, on

19  the -- something else?

20    MS. LOPEZ:  Your Honor, can I just clarify, too?

21    I think he was arrested on the state charge, that's

22  from 2019.  And then I think he was deported from the state

23  charge.  And then I don't think has had any physical contact

24  with his -- with his daughter or the daughter's mother since

25  that time.

1        THE COURT:  Has he been in touch with them by

2   telephone?

3        MS. LOPEZ:  And I think -- I mean, we could clarify

4   with him.  My understanding is that he's had some contact, but

5   it hasn't been, you know, like regular Facetimes or -- you

6   know, I think he's had some contact.  And I think he would like

7   to have a relationship with her.  It's been very difficult for

8   him in Mexico, you know, with very limited economic

9   opportunities.  He doesn't have -- he can't afford like a

10   smartphone down there.

11        THE COURT:  Sure.

12        MS. LOPEZ:  So he can talk to her regularly.  But

13   certainly that would be a goal of his if -- you know, if there

14   were an opportunity for him to come back legally, I think he

15   would very much like to do that.  But that's not the

16   circumstance that he's in.  And I don't think he's had -- you

17   know, it's not like they've had, like, weekly telephone calls.

18        THE COURT:  Okay.  Ms. Williams, on behalf of the

19   United States?

20        MS. WILLIAMS:  Yes, Your Honor, the defendant does

21   have the two prior removals.  We are going to recommend a

22   sentence here of 24 months.  We believe that a six-month

23   variance is appropriate, given his upbringing and the

24   conditions that he was living in Mexico.  And even the recent

25   conditions living near the border during the beginning of the

1  COVID period there.

2      We would defer to the Court as to the sentence that

3  should be imposed on the 2019 case for the breach of the

4  Court's trust.  But with that, the United States would submit

5  unless the Court has any other specific questions.

6      THE COURT:  All right.  You know, we should probably

7  cover that, too.  And then I can impose sentence or sanction at

8  the same time.

9      You want to speak to that?  Your request is three

10 months on that, right?

11     MS. LOPEZ:  That's correct, Your Honor, and I don't

12 have anything further --

13     THE COURT:  All right.

14     MS. LOPEZ:  -- to offer, except I would ask the Court

15 to consider all the same factors that apply to 1326.

16     THE COURT:  All right.  Mr. Rodrigues, I want to give

17 you another opportunity to speak.  There's two matters in front

18 of me.  You've spoken to one.  That's the newest case today

19 that I found you guilty of coming into the United States, or

20 attempting to come in again.  But then there's the old case.

21 It's the case that we talked about just a minute ago, where you

22 promised me you wouldn't come back and you were on probation.

23     You face a sanction.  It is punishment in a form.  I

24 mean, it's not supposed to be -- the purpose of it is not to

25 punish you, but it's to address the breach of trust that you

1    committed by breaking your promise and committing a new crime,

2    coming back into the United States.

3          And you face up to 24 months on that.  So I'm happy to

4    hear from you as to that, if there's anything else you want to

5    say.

6          THE DEFENDANT:  No, that is all.

7          THE COURT:  Okay.  All right.  So the Court agrees

8    with the parties' guideline calculations.  The base offense

9    level is 8.  8 points are added because of the criminal threats

10   conviction, and 4 additional points are added because of the

11   prior 1326 conviction.

12         The starting upward offense level is a 20.  The Court

13   finds that the defendant's accepted responsibility, the

14   government's recommended the additional point, so I adjust

15   downward to a 17.

16         The defendant, I'm told, is in category III.  And the

17   guideline range applicable to him is 30 to 37 months.  I'll

18   keep the range in mind as I go to the 3553 factors.

19         As 1326 cases go, I find this to be pretty

20   unaggravated.  And I say -- I qualify it by saying pretty

21   unaggravated, because he does have a recent prior, and that's

22   not a good thing.

23         But, you know, we see so many of these cases.  And

24   it's so often the case that the person has a terrible

25   immigration record, whether felony or misdemeanor.  And has

1  come in repeatedly.  I usually see cases where the person's
2  been repeatedly deported over many, many years.

3         So I mention that as to the first 3553(a) factor,
4  because I'm to take into consideration the nature and
5  circumstances and seriousness of the offense.  And I rate this
6  offense, as 1326 offenses go, toward the more benign end of the
7  spectrum.  Certainly there are cases that are less egregious
8  than this, where a person doesn't have a conviction at all.

9         When I look at the defendant's history and
10 characteristics, part of what I've just said applies to that.
11 I'm a little concerned about his characterization of the prior.
12 I think there was more to that than just a threat.  Now, you
13 know, on the face of things, he pled to a charge that alleged
14 just a threat.  But my instincts and experience over 41 years
15 tells me that you don't go to prison for 28 months for shouting
16 a threat at somebody.

17        I don't know, maybe Judge Roy Bean would do that, and
18 I take your point that there's variations in sentencing
19 practices among judges.  But I can't imagine a judge for
20 somebody shouting a threat, even with a child present, would
21 send somebody to prison for 28 months.

22        So I don't think we've gotten the full version of
23 that.  Nonetheless, I'm willing to go forward without insisting
24 that you find out what happened in that case.  I wouldn't do
25 that again, obviously, if the defendant comes back, I'm going

1   to want to know about that prior.

2          I am disappointed that the defendant broke his promise

3   and came back.  I understand the circumstances.  I have a feel

4   for the conditions, Ms. Lopez, that you described.

5          My own father grew up in similar conditions, no

6   running water, no electricity, subsistence living, never more

7   than 20 miles from his house until World War II took him into

8   the draft.

9          So -- and I visited relatives when I was younger that

10  lived under those conditions.  So I do have a sense.  It is a

11  grinding existence.  And I understand why a person would be

12  motivated to escape from that.  Particularly with the United

13  States border and all the opportunities that are available here

14  so close by.

15         So I understand the motivation.  And the defendant's

16  clarified he's also got family here, including a young

17  daughter.  So I understand all of that.  You've made the point

18  that custody was particularly rough.  I'm generally

19  unsympathetic to that, except in this case, the defendant was

20  arrested before the COVID outbreak hit, and he's been in

21  custody, right?

22         MS. LOPEZ:  No, he was arrested -- sorry, he was

23  arrested in May.

24         MS. WILLIAMS:  May 22nd, so just after the outbreak.

25         THE COURT:  Okay.  All right.  Well, then let me go

1   back.  I'm a little less sympathetic to that, Ms. Lopez.  I

2   don't know if you've heard me say this before, but certainly by

3   May of 2020, everybody this side of the border, and in Tijuana,

4   was aware of COVID, right?  We were all taking special

5   precautions.  And the defendant knew full well that if he got

6   caught coming across, he'd be incarcerated.

7           He knew what it was like to be incarcerated.  He'd

8   spent three months in federal custody before for this, and, you

9   know, at least half time on the 28-month sentence.  He would

10  have known that custody involves close proximity to other

11  people, and probably be locked up in a cell with somebody else.

12          He chose the time and the place and the manner in

13  which he entered, and he entered right in the midst of the

14  pandemic.  So I'm less sympathetic to that as a circumstance,

15  while I do acknowledge that prison conditions are difficult.

16          I suppose between other places where he could have

17  been held, and then being held -- was he in San Luis or was in

18  El Centro?

19          MS. LOPEZ:  I think he was in both.  He was in El

20  Centro.  He was at in the new GEO facility, Your Honor.

21          THE COURT:  All right.  So anyway, that's what I have

22  to say about that.

23          But when I take into consideration the just punishment

24  and deterrence and promoting respect for the law, two of those

25  really are implicated strongly here.  One is deterrence and

then promoting respect for the law.  I say that given the

defendant's admission that, you know, within, what, a year or

so of making the promise to me that he wouldn't come back, he

did.  And you can't ignore that.  If you ignore that, as a

judge, or the system ignores that, then no one has respect for

the law.  It's empty admonitions to people.

On the other hand, I think just punishment supports

your argument that even the low end of the guidelines is too

long.  The government acknowledges that.  They've asked for a

six-month variance down to 24 months.

3553(a)(6) requires me to consider the kinds of

sentences and to do an analysis of the defendant vis-a-vis

other similarly situated offenders.  And when I do that, I

think that even argues for a lower sentence.

In this case, I'm inclined to follow your

recommendation on the principal case, the new conviction.  He's

been in custody now 13 months.  And because deterrence is

important and the Court can achieve greater deterrence by

placing the defendant on probation again, it gives a five-year

term rather than the cap of three years, as if he were on

supervised release.

I do place him on probation once again.  This is on

20-CR-1684.  The term of probation is five years.  So I'm not

sentencing him to time served, but that's the effect of

imposing probation at this point.  Probation is an authorized

1    sentence since it's a class B felony.

2          Two conditions.  Mr. Rodrigues, listen carefully now.

3    The first is you're not to come back to the United States.  You

4    have no right to be here.  I'm not going to even entertain the

5    possibility that you can come in legally, because you can't.

6    You've been twice convicted of this and you have a conviction

7    for criminal threats.

8          The government is not going to let you in.  They're

9    not going to give you permission to come back, so don't come

10   back anymore.

11         I understand that's a hardship because your family is

12   here.  You're going to have to find a way to interact with your

13   family, with you in Mexico.  Is your daughter a U.S. citizen?

14         THE DEFENDANT:  Yes.

15         THE COURT:  And is her mother lawfully here?  Does she

16   have the ability to travel to and from Mexico from the United

17   States and come back in?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Okay.  So if there's to be a reunion

20   between you and your family, they're going to have to come

21   south.  You can't come north.

22         The second condition is that you not violate any

23   United States law.  Now, you notice today, I'm not asking you

24   to make me a promise, because you promised once before, and you

25   proved to be untrustworthy.  But I'll make you a promise.  If

1  you come back, and you violate this grant of probation, you're

2  going to go to jail for a long time.

3       You faced up to 37 months here. If I see you a third

4  time coming back and violating the Court's order, then I would

5  likely impose that longer sentence next time.

6       So that's it. Probation on those two conditions. The

7  Court declines to impose a fine.

8       Ms. Williams, given his circumstances, if you move to

9  remit the penalty assessment, I would not impose that either.

10      MS. WILLIAMS: So moved, Your Honor.

11      THE COURT: No penalty assessment.

12      Now, as to this case, this new case that I've just

13  sentenced you on, you'll be released from custody on this, and

14  then you'll be subject to the two conditions of probation that

15  I just set. But you have a right to appeal. You did not waive

16  that right.

17      So you can appeal rulings made by the Court. There

18  was one ruling in particular you wanted to appeal, Ms. Lopez?

19  I don't know which one it was. What was it?

20      MS. LOPEZ: Your Honor, we filed a motion to dismiss

21  the indictment, arguing that it violates equal

22  protection under --

23      THE COURT: Arlington Heights?

24      MS. LOPEZ: Yes.

25      THE COURT: Okay. All right. I remember that now.

 1          So you have the right to appeal the Court's rulings on

 2     pretrial motions.  And if you think this sentence was wrong

 3     procedurally, or it's too long, then you can appeal the

 4     sentence, too.

 5          Ms. Lopez will tell you exactly what the appeal can

 6     include.  But what you need to know is you have 14 days from

 7     today's date, if you intend to appeal, to file the notice of

 8     appeal.

 9          Ms. Lopez will do that for you, but she'll consult

10     with you, and you tell her whether you want to appeal.  But you

11     have to file the paperwork for the appeal within 14 days.

12          If you appeal, then a higher court, a court with

13     greater authority consisting of three judges will look over the

14     entire record here, both pretrial and sentencing, determine

15     whether any mistakes were made.  If they determine there were

16     mistakes, they'll send it back for me to correct the mistakes.

17          If there were no mistakes, then they will affirm the

18     decisions that I made.  So that's the Court's ruling as to

19     20-CR-1684.

20          Turning to the case for which the defendant was on

21     probation, the Court revokes probation on that case based on

22     the defendant's commission of new offenses.

23          He faces a guideline of six to 12 months, and up to 24

24     months, because his original sentence was the result of a

25     variance, probably also a departure.  Did he get a departure

1  for Fast Track last time?

2         MS. LOPEZ: He did.

3         MS. WILLIAMS: He did, Your Honor.

4         THE COURT: Okay. So he faces up to 24 months. I'm

5  not going to consider a sentence outside the guidelines.

6         And given that the circumstances of the probation

7  violation track the new offense, I'm mindful that the

8  defendant's already been punished for that offense. He's done

9  13 months in custody for that. Punishment is not one of the

10  factors the Court can consider in imposing a sanction for

11  13 -- I'm sorry, for a probation violation.

12         What I can consider, though, are deterrence, need for

13  deterrence. And I think there is a need for both -- well, for

14  specific deterrence, in particular, here, given that the

15  defendant violated probation very quickly after he was placed

16  on it. And as he recounts, he made a solemn promise to me that

17  he wouldn't come back.

18         And I can take into consideration also the breach of

19  trust, which there surely was in this case. I find that the

20  sanction for the defendant for breaching the Court's trust and

21  coming back in derogation of the promise he made is six months.

22  That six month sentence to be served consecutively to the

23  sentence that he's just served.

24         So what that means is the defendant has an additional

25  six months in custody on the former probationary case,

1    19-CR-2118.  As to that case, once he's finished the six-month

2    sanction, the defendant shall be on supervised release for a

3    period of three years.  This is on case 19-CR-2118.

4           I set two conditions for supervised release.  Number

5    one, he's not to return to the United States in the future

6    without permission of the United States Government.  Number

7    two, he's not to commit any violations of law.

8           So he's on supervised release on that case.  He's on

9    probation on the new case.  The term of supervised release will

10   run concurrently with the probationary term.

11          Mr. Rodrigues, let me make sure you understand what

12   the consequences are if you come back now.  You're beholden to

13   me on two cases now.  And if you come back, in addition to

14   whatever new charge they bring against you, you're going to

15   face additional time on both of these cases.

16          So don't come back again.  As I said, I'm not going to

17   elicit a promise from you.  You've proved to be untrustworthy

18   about your promise, but I'm telling you, don't come back

19   because I keep my word.  And you'll have a lot of time to spend

20   in custody if you come back again.

21          Okay.  That's all.  I wish you well.

22          MS. LOPEZ:  May I just have a moment with him, Your

23   Honor?

24          THE COURT:  Sure.

25          MS. LOPEZ:  Thank you.

1          THE COURT:  We'll give you the exhibits back.

2          MS. WILLIAMS:  Thank you, Your Honor.

3          THE COURT:  You're to hold the exhibits pending any

4     appeal, particularly of the sentence.

5          MS. WILLIAMS:  Thank you, Your Honor.

6      (The proceedings concluded at 12:21 p.m., June 15, 2021.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3       I, CYNTHIA R. OTT, Official Court Reporter, United States

4   District Court, Southern District of California, do hereby

5   certify that pursuant to 28 U.S.C. §753 the foregoing is a

6   true, complete and correct transcript of the stenographically

7   reported proceedings had in connection with the above-entitled

8   matter and that the transcript page format is in conformance

9   with the regulations of the Judicial Conference of the United

10  States.

11

        DATED at San Diego, California, July 16, 2021.

12

13

14                         _____/s/ CYNTHIA R. OTT_____
                           CYNTHIA R. OTT, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25